CARRIE L. KARR, Plaintiff-Appellant and Cross-Appellee, v. MICHAEL NOEL *et al.*, Defendants-Appellees (Stanton Schiller, Defendant-Appellee and Cross-Appellant).

Fifth District   No. 5—89—0025

Opinion filed May 7, 1991.

Roy C. Dripps, of Talbert & Mallon, P.C., of Alton, for appellant.

Robert S. Rosenthal, of Brown, James & Rabbitt, P.C., of Belleville, for appellee Bjong-Suhn Tschoe.

Peter von Gontard and Ronald L. Vance, both of Shepherd, Sandberg & Phoenix, of Belleville, for appellee Stanton Schiller.

PRESIDING JUSTICE RARICK delivered the opinion of the court:

Plaintiff, Carrie Karr, brought this action in the circuit court of St. Clair County to recover damages for alleged negligent treatment of a spider bite. Following trial, the jury returned a verdict in favor of the defendants, Bjong-Suhn Tschoe, M.D., and Stanton Schiller, M.D., and Karr appeals.

At trial, Karr testified that around 7 p.m. on July 26, 1982, she was bitten on the upper right thigh by what she believed to be a brown recluse spider. She went to the emergency room at Belleville Memorial Hospital and took the spider with her. She first saw Dr. Michael Noel and then saw Dr. Stanton Schiller. Karr told Schiller that she had been bitten approximately 30 minutes before, that she was pregnant, and that she had put ice on the bite before coming to the hospital. Schiller said he was unable to identify the spider and would call in a pathologist. When Karr saw Schiller again a short time later, she was told that he had spoken with her obstetrician, Dr. Burpo, and had sent the spider to a pathologist for identification.

As they waited for the pathology report, Schiller told Karr that if it was a brown recluse, they would excise the area and there would be a small scar. When he received the pathologist's report, Schiller told

her the pathologist was unable to determine if the spider was a brown recluse. Dr. Schiller then made an appointment for Karr with Dr. Bjong-Suhn Tschoe, a plastic surgeon, for July 28, 1982. Schiller also told Karr to call the doctor if any systemic symptoms, such as vomiting or dizziness, occurred. He also gave her two prescriptions, but she did not know what they were.

After leaving the hospital, the area of the bite began to grow in size and began turning purplish. This continued throughout the next day and by that evening, Karr began experiencing dizziness and nausea. When Karr saw Dr. Tschoe on July 28, 1982, he did not ask her what the spider looked like. When she asked if there would be a big scar if the wound were excised, he stated that it was too late at that point because of the size, and that he would have to wait to see how much would slough. At that point, he told her, he would excise the area and perform a skin graft. Tschoe had Karr return on August 2, 1982. He examined the bite, which was darkening and sloughing, but performed no further treatment. Tschoe had Karr return again on August 11, 1982, at which time he indicated that the area was as large as it was going to get. Tschoe admitted Karr to the hospital for the purpose of excising the area. Karr was also subsequently admitted to the hospital for the skin graft.

When Karr was released to go back to work on August 11, she was told her job was no longer available. She began seeking other types of employment and eventually found another job in July of 1983, 10 months after being released. Karr testified that as a consequence of the bite, she does not like going out in public, does not wear shorts, and does not go swimming anymore. She described the scar as quite ugly and said that if someone bumps her on that side it hurts.

Dr. Stanton Schiller testified that he was covering the emergency room at Belleville Memorial Hospital on July 26, 1982, when Karr came in complaining of a spider bite. He observed a red, raised area approximately two centimeters in diameter on her upper right thigh. While Karr was monitored for any systemic reaction, Schiller sent the spider to a pathologist and contacted Karr's obstetrician, Dr. Burpo, regarding acceptable medication. Schiller received the pathologist's report later that evening. The pathologist was unable to determine if the spider was a brown recluse, but indicated that it might be related to the loxosceles family, which includes the brown recluse. Schiller testified that he decided to treat Karr based on a worst-case scenario. Schiller then decided to consult with a plastic surgeon, and Dr. Burpo recommended Dr. Tschoe. Schiller called Tschoe and told him that

Karr had been bitten approximately 30 minutes before coming to the emergency room, that she had a raised reddish area two centimeters in diameter on her thigh, and that, while the pathologist was unsure if the spider was a brown recluse, he thought it might be related to the loxosceles genus. Schiller scheduled an appointment for Karr with Dr. Tschoe for July 28, 1982, and told her to call Tschoe if she experienced any systemic reaction.

Dr. Bjong-Suhn Tschoe testified that on July 26, 1982, he received a call from Dr. Schiller and was told that he had a patient with an apparent brown recluse spider bite. He told Schiller to prescribe general comfort medication and local treatment such as ice. Schiller scheduled an appointment for Karr on July 28, 1982. When Tschoe saw Karr, he observed a 10-centimeter lesion. He explained to Karr his proposed course of treatment, but denied telling her that it was too late to excise the lesion. Tschoe testified that he decided to treat the bite as if it were a brown recluse bite. The treatment plan was to watch Karr and treat her according to what developed. Tschoe testified that a majority of spider bites heal on their own and he wanted to see if this one would. He further testified that a certain percentage of brown recluse bites do not heal and excision of the tissue and a skin graft become necessary.

Tschoe had Karr return on August 2, 1982. He observed that the area was the same size but had grown much darker. He saw Karr again on August 11, 1982, at which time the lesion had begun to get hard. Tschoe felt the tissue had become necrotic and had Karr admitted to the hospital to remove the dead flesh in preparation for a skin graft. Karr was admitted to the hospital again on August 16, 1982, for the graft.

Dr. Robert Arnold testified as an expert witness for Karr. Arnold is a board-certified general surgeon and was the chief of surgery at Camp LeJune. He has authored numerous articles on spider bites.

Arnold testified that his practice for treating spider bites was to examine the bite and prescribe antibiotics, and monitor the patient on a daily basis. Usually, the bites would heal on their own, but if the area enlarged to one centimeter he would excise it. Arnold stated that he chose the one-centimeter benchmark because he felt this he could excise and stitch closed.

Arnold stated that if the area were two centimeters in diameter, he would put the patient on antibiotics and see him again that day or the next, and would probably go ahead and excise the bite. If the bite grew to three centimeters he would excise it immediately, or, if the area were red and swollen, he would prescribe antibiotics and excise

it the next day. Arnold indicated that three centimeters was almost past the point where it could be closed without a graft.

Based on his review of the hospital records and the depositions of Schiller, Tschoe, and Karr, Arnold concluded that, based upon a reasonable degree of medical and scientific certainty, the defendants failed to exercise the degree of skill and care required in the situation. Specifically, Dr. Schiller should have insisted that Dr. Tschoe see Karr the evening of the 27th, and that was the latest Tschoe would have been justified in seeing her. The bite should have been excised then, so it could have been closed without a skin graft. Based on the pathologist's report, the bite should have been treated as if it were a brown recluse bite. In any event, the report indicated that the spider was from the loxosceles family and the venom of all spiders in that genus has the same effect. In support of his opinions, Arnold listed nine medical texts which he considered authoritative.

On cross-examination, Arnold admitted that there was no deviation from acceptable standards of care in the treatment Karr received in the emergency room. He also admitted that doctors disagreed as to the appropriate method of treating brown recluse bites, but indicated that there was no disagreement as to whether they should be excised. He stated that the goal of treatment is excision and primary closure, that is, closure of the excised area without a skin graft, and that there was no disagreement among physicians and authors as to whether to excise brown recluse bites. Defense counsel attempted to impeach Arnold with two texts, *Emergency Medicine*, which indicates that there is a concern about early excision, and *Current Therapy*, which indicates that excision and repair should be delayed until the area of necrosis is well delineated.

Dr. Lawrence Lewis testified as an expert for Dr. Schiller. Dr. Lewis stated that there were several acceptable ways of treating brown recluse bites, none of which were perfect, but that the general consensus was to treat the bite conservatively because most bites healed on their own. Lewis testified that a red, raised area alone did not justify excision, even if the area were two centimeters. Lewis also stated that the care given Karr in the emergency room met the standard of care for brown recluse bites.

Dr. Vernon Young, a board-certified plastic surgeon, testified on behalf of Dr. Tschoe. Young, who treats two to three brown recluse bites each year, indicated that his treatment plan would be to examine the person and, if possible, determine the type of spider, check the size and location of the bite and observe any reaction to it, give the patient a tetanus shot, and continue to observe the patient periodi-

cally and treat any long-term problem that developed. Young also stated that, while a majority of bites heal on their own, in some cases the tissue will become necrotic, necessitating excision.

Young also testified that his opinion was based in part on a review of medical literature on the subject of brown recluse bites. Young found that authors of texts which recommended early excision relied primarily on pre-1980 articles. Until that time, he found there was little controversy on the issue. After 1980, he found no articles recommending early excision. Plaintiff's counsel pointed out several articles in Young's file which recommended excision if the area of the bite was one centimeter or larger, and Young admitted that in a 1988 article, he wrote "early total excision appearing to be the only method offering any measure of success, and late manifestations are best treated by excision of all necrotic tissue followed by split thickness skin grafting."

Karr first argues that the trial court erred in allowing Dr. Tschoe to testify that certain medical texts supported his opinion and were recognized as authoritative. Prior to Tschoe's testimony, plaintiff's expert, Dr. Arnold, was cross-examined with certain medical texts. Plaintiff objected on the grounds that no foundation had been laid for the texts in question. The trial court overruled the objection based on defense counsel's representation that later testimony would authenticate the texts. Tschoe's testimony was used for this purpose. Because he did not describe any medical texts as authoritative in his deposition, Karr maintains, Tschoe should have been precluded by Supreme Court Rule 220 from testifying at trial that they were authoritative. We agree.

■ Supreme Court Rule 220, governing the disclosure and discovery of expert witnesses, provides in pertinent part:

"(b) Disclosure.

(1) *** In order to insure fair and equitable preparation for trial by all parties the identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party ***.

***

(c) Discovery.

(1) Upon interrogatory propounded for that purpose, the party retaining or employing an expert witness shall be required to state:

(i) the subject matter on which the expert is expected to testify;

(ii) his conclusions and opinions and the bases therefor; and

(iii) his qualifications.

\* \* \*

(4) The provisions of paragraphs (c) and (d) hereof also apply to a party or an employee of a party who will render an opinion within his expertise at the time of trial. However, the provisions of paragraphs (c) and (d) do not apply to parties or employees of entities whose professional acts or omissions are the subject of the litigation. The opinions of these latter persons may be the subject of disclosure by deposition only.

\* \* \*

(d) Scope of Testimony. To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings through interrogatories, depositions or requests to produce, his direct testimony at trial may not be inconsistent with or go beyond the fair scope of the facts known or opinions disclosed in such discovery proceedings. However, he shall not be prevented from testifying as to facts or opinions on matters regarding which inquiry was not made in the discovery proceedings." 107 Ill. 2d Rules 220(b)(1), (c)(1), (c)(4), (d).

■ As a party whose professional acts were the subject of the litigation, Karr argues, Dr. Tschoe's opinions were subject to disclosure by deposition under Supreme Court Rule 220(c)(4). Because he did not identify in his deposition the medical texts in question as authoritative, his testimony at trial that they were authoritative exceeded the scope of his opinions disclosed in discovery in violation of section (d). The last sentence of section (d) is not applicable to the present case because Dr. Tschoe admitted that inquiry was made at his deposition as to what texts he relied on to form his opinion and he could not remember the names of any.

In *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 529 N.E.2d 525, our supreme court considered the issue of whether a treating physician who will testify to a medical opinion at trial is an expert witness within the meaning of Rule 220(b)(1). Relying on the language of subsections (b)(1) and (f), our supreme court held treating physicians who testify to a medical opinion at trial are not expert witnesses within the meaning of Rule 220. The court reasoned that Rule 220

"obliges litigants to disclose the identity and opinions only of those witnesses who are engaged for the purpose of giving an expert opinion at trial. It may be said that the connection between a medical expert who is 'retained to render an opinion at trial' and the party to the suit may be litigation-related, rather

than treatment-related. Treating physicians, on the other hand, typically are not 'retained to render an opinion at trial' but are consulted, whether or not litigation is pending or contemplated, to treat a patient's physical or mental problem. While treating physicians may give opinions at trial, those opinions are developed in the course of treating the patient and are completely apart from any litigation. Such an opinion is not formed in anticipation of a trial, but is simply the product of a physician's observations while treating the patient, which coincidentally may have value as evidence at a trial. In this respect, the opinions of treating physicians are similar to those of occurrence witnesses who testify, not because they were retained in the expectation they might develop and give a particular opinion on a disputed issue at trial, but because they witnessed or participated in the transactions or events that are part of the subject matter of the litigation." (*Tzystuck*, 124 Ill. 2d at 234-35, 529 N.E.2d at 528.)

Karr points out, however, that *Tzystuck* did not involve a treating physician who was a party to the litigation. In *Fawcett v. Reinertsen* (1989), 131 Ill. 2d 380, 546 N.E.2d 558, the treating physician was a party defendant and our supreme court, relying on its previous decision in *Tzystuck*, held that, as a defendant physician's involvement in a case is clearly "treatment-related," he is not an "expert witness" within the meaning of Rule 220(b)(1) and the disclosure provisions of Rule 220(b)(1) do not apply. (*Fawcett*, 131 Ill. 2d at 384-85, 546 N.E.2d at 560.) We note, however, that both the Historical and Practice Notes of Rule 220 and the language of section (c)(4) contemplate that a party may be an expert witness for some purposes. The Historical and Practice Notes provide:

"[U]nder rule 220 a party or an employee of a party to the litigation may be an expert for certain purposes in the action. Note too that the rule contemplates that discovery from expert witnesses whose professional acts or omissions are not the subject of the litigation will be initiated by interrogatories, which like interrogatories on other subjects can be answered by production of the relevant documents ***.

The rule does not purport to limit the opposing party to discovery from experts by interrogatories. *It does, however, bar the use of interrogatories to elicit expert opinions from experts whose professional acts or omissions are the subject of the litigation, and limits discovery on those subjects from such experts to depositions.*" (Emphasis added.) (Ill. Ann. Stat., ch. 110A,

par. 220, Historical and Practice Notes, at 442 (Smith-Hurd 1985).)

Section (c)(4) of the rule provides that the opinions of parties whose professional acts or omissions are the subject of the litigation may be the subject of discovery by deposition only. (107 Ill. 2d R. 220(c)(4).) Yet, if we accept that *Fawcett* stands for the proposition that a defendant physician may never be an expert for the purposes of Rule 220, then the last two sentences of section (c)(4) of the Rule are rendered meaningless because a defendant physician whose acts or omissions are the subject of the litigation will always be a treating physician, and thus exempt from Rule 220. We can think of no situation where a physician whose acts or omissions are the subject of the litigation would not be a treating physician. *Fawcett*, however, dealt only with section (b)(1) and not sections (c) or (d). *Fawcett* stands only for the proposition that a defendant physician is not an expert witness for the purposes of section (b)(1), and so need not be disclosed. A defendant physician may still be an expert witness for the purpose of sections (c) and (d). He is subject to discovery by deposition only, and the scope of his testimony at trial may not exceed that of his deposition testimony. In this case, Tschoe's testimony that certain texts were authoritative clearly exceeded the scope of his deposition testimony.

■ Karr next argues that the trial court erred in allowing Dr. Young, Tschoe's expert, to testify concerning articles published after 1982 as such material was irrelevant. The introduction of such material, Karr maintains, severely prejudiced her because after 1982 the drug Dapsone became available and its effect is to localize the effect of the bite, which renders early excision anachronistic. Consequently, articles written after 1982 would be more likely to recommend against early excision. Dr. Young testified that he was the author of an article which was published in the *Annals of Plastic Surgery.* Young indicated that when contacted about testifying in this case as an expert witness, he undertook a review of medical literature on the subject of brown recluse spider bites to determine whether the care he had been giving his patients was proper. He then determined that the subject would make a good review article. Dr. Young gave his opinion as to the recommended treatment based on his literature review and personal experience. The materials Young reviewed dated from 1967 to 1988. Young indicated that until about 1980, there was a controversy regarding whether the bite should be excised only, or whether it should be observed to see if any necrosis would develop and the dead tissue subsequently removed. He also indicated that

there was a controversy as to what constituted early excision. Young then testified that, based upon his experience and review of the medical literature, he did not recommend early excision and, in explaining the basis for his opinion, specifically referred to two post-1982 articles—articles written after the development of Dapsone. Tschoe maintains that the articles in question were admitted not for the purpose of bringing the Dapsone research to the jury's attention, but to point out that the accepted method of treatment changed around 1980 from early excision to allowing the bite to eschar before excision. Upon a review of Dr. Young's testimony we find that on several occasions, Tschoe's counsel asked Young what the recommended treatment was in 1982 and what treatment plan he recommended in his article. At one point, Young also indicated that, not considering Dapsone, treatment had not changed from 1982 to 1988. While Tschoe may have elicited this testimony to show that the standard of care changed in 1980, the effect of allowing Dr. Young to testify as to his opinion on the proper course of treatment set forth in his article, an article based on both pre-and post-1982 articles, was to place irrelevant and highly prejudicial evidence before the jury, and as a result this cause must be remanded for a new trial.

■ We must next determine whether the cause must be remanded as to both defendants, or only as to Dr. Tschoe. Where it is impossible to separate multiple defendants as to the prejudice engendered in the minds of the jury, justice requires a retrial as to all. (*Bisset v. Village of Lemont* (1983), 119 Ill. App. 3d 863, 457 N.E.2d 138; see also *Meldoc Properties v. Prezell* (1987), 158 Ill. App. 3d 212, 511 N.E.2d 861.) However, this is not such a case. The prejudicial evidence introduced by Dr. Young regarding post-1982 articles could have had no prejudicial effect on the jury's evaluation of the treatment Dr. Schiller rendered in the emergency room. Based upon a careful review of the record, we find that remanding the cause for retrial as to Dr. Schiller would be both unnecessary and unjust. The judgment as to Dr. Schiller is affirmed.

■ Karr also argues that the trial court erred in giving the instruction which states, "If you decide for the defendant[s] on the question of liability, you will have no occasion to consider the question of damages." (Illinois Pattern Jury Instructions, Civil, No. 36.01 (2d ed. 1971) (hereinafter IPI Civil 2d).) We recognize, as Karr points out, that this instruction has been criticized as duplicative (see *Misch v. Meadows Mennonite Home* (1983), 114 Ill. App. 3d 792, 449 N.E.2d 1358), but we are unaware of any authority, and Karr has cited none, which holds that the giving of such instruction is erroneous. Based

upon our review of the record, we are not persuaded that the giving of IPI Civil 2d No. 36.01 in this case was an abuse of discretion. See *Mattice v. Goodman* (1988), 173 Ill. App. 3d 236, 527 N.E.2d 469.

■ Karr also argues that the trial court erred in denying her post-trial motion for a judgment notwithstanding the verdict and her motion for a new trial. A careful review of the record leads us to conclude that the plaintiff's motions were properly denied. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504; *Piano v. Davison* (1987), 157 Ill. App. 3d 649, 510 N.E.2d 1066; *Nunley v. City of Cahokia* (1983), 115 Ill. App. 3d 208, 450 N.E.2d 363.

■ Schiller argues in his cross-appeal that the trial court erred in denying his motion for sanctions. Dr. Schiller's motion for sanctions sought attorney fees and expenses based on plaintiff's termination of the discovery deposition of Dr. Lewis. The trial court indicated that the plaintiff's explanation for terminating the deposition, that Dr. Lewis did not bring his notes and files, was not acceptable, and that Dr. Schiller's motion was well taken, but refused to impose monetary sanctions.

The imposition of sanctions for failure to comply with reasonable discovery practices is a matter left to the discretion of the trial court. (*Plost v. Louis A. Weiss Memorial Hospital* (1978), 62 Ill. App. 3d 253, 378 N.E.2d 1176.) Based upon our review of the record, we find no abuse of discretion.

For the foregoing reasons, we affirm the judgment of the circuit court of St. Clair County as to defendant Schiller, and reverse and remand for a new trial as to defendant Tschoe.

Affirmed in part; reversed and remanded in part.

CHAPMAN and HOWERTON, JJ., concur.