SUSAN GRANBERRY, by her Mother and Next Friend, Carol Granberry, et al., Plaintiffs-Appellants, v. CARBONDALE CLINIC, S.C., et al., Defendants-Appellees.

Fifth District    No. 5—92—0628

Opinion filed November 13, 1996.

Rex Carr, Gerald L. Montroy, and Michael B. Marker, all of Carr, Korein, Tillery, Kunin, Montroy & Glass, of East St. Louis, for appellants.

Paul R. Lynch, of Craig & Craig, of Mt. Vernon, for appellee Carbondale Clinic, S.C.

John E. Fick, of Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, for appellee Joseph C. Tsung, M.D.

James E. Neville and Shari M. Brunton, both of Neville, Richards, Defranco & Wuller, of Belleville, for appellee Urduja Pulido, M.D.

JUSTICE MAAG delivered the opinion of the court:

Plaintiffs, Susan Granberry, by her mother and next friend, Carol Granberry, and Carol Granberry, individually, filed an eight-count complaint on May 4, 1984, in the circuit court of Jackson County alleging medical malpractice against defendants, Carbondale Clinic, Joseph C. Tsung, M.D., William R. Hamilton, M.D., and Sidney G. Smith, M.D. More specifically, the complaint alleged, *inter alia*, that because defendants were negligent in treating Carol's preeclampsia, she delivered a premature child that suffered from respiratory distress syndrome, hyperbilirubinemia, birth trauma, hyponatremia, hypocalcemia, cerebral palsy, and spastic quadriparesis. On June 26, 1985, plaintiffs amended their complaint, adding Dr. Urduja Pulido as an additional defendant.

Susan's cerebral palsy was caused by a brain lesion known as periventricular leukomalacia. Periventricular leukomalacia is a destruction of the white matter next to and above the brain ventricles. Due to plaintiffs' main theory of malpractice that Susan's brain lesion would not have developed but for the negligent failure to deliver Susan as soon as Carol developed severe preeclampsia, plaintiffs needed to establish that Susan's brain lesion developed *in utero* as a result of Carol's severe preeclampsia.

The trial lasted nearly four months, with the jury returning a verdict in favor of defendants. Plaintiffs' post-trial motion was denied, and a timely notice of appeal was filed.

Plaintiffs claim that the trial court erred in refusing to allow them to ask Dr. Allan Bennett, a treating obstetrician, a hypothetical question designed to elicit a conditional admission of liability merely because Dr. Bennett did not agree with the condition.

The relevant facts are as follows. Dr. Roger Klam, an obstetrician and gynecologist, testified on June 15, 1989. Dr. Klam was the attending obstetrician at the time of Susan's birth due to the fact that he was the doctor on call on May 24, 1982. Dr. Klam stated that the fetal heart monitor tracings at the time of Carol's labor "looked perfectly normal." Over the course of several pages of transcript, Dr. Klam agreed that Carol had heartburn complaints consistent with epigastric pain; elevated liver enzymes on May 17, 1982, and May 24, 1982; 160 systolic on two or more occasions while at bed rest six

hours apart; three-plus edema; and two-plus persistent proteinuria for two weeks. He agreed that these symptoms "can be indicative of severe preeclampsia and according to 'Williams,' they are." Plaintiffs' counsel listed the aforementioned symptoms and the sentence in quotation marks on plaintiffs' exhibit No. 98. It appears from a review of the record that at this point in Dr. Klam's testimony, plaintiffs' exhibit No. 98 read as follows:

"Carol Granberry
She had:
1. Heartburn complaints consistent with epigastric pain[.]
2. She had markedly elevated liver enzymes on 5-17-82 and 5-24-82[.]
3. She had 160 systolic on 2 or more occasions while at bedrest 6 hours apart[.]
4. She had 3+ edema.
5. 2+ persistent proteinuria for 2 weeks.
These can be indicative of severe pre-eclampsia and according to 'Williams['] they are[.]
Per Dr. Klam—6-15-89[.]"

Approximately 60 pages later, plaintiffs' counsel asked Dr. Klam if Carol suffered from three-plus brisk reflexes during the course of her pregnancy while she was hospitalized. Dr. Klam stated that he remembered seeing it one time. Then, the following colloquy between plaintiffs' counsel and Dr. Klam occurred:

"Q. [by plaintiffs' counsel] *** [B]risk reflexes *** is [sic] another indication of severe preeclampsia, isn't it, sir?
A. [by Dr. Klam] It's a warning sign. *** It can be. It's one thing that—it might." (Emphasis added.)

Plaintiffs' counsel then completed plaintiffs' exhibit No. 98, and in its entirety, it reads as follows:

"Carol Granberry
She had:
1. Heartburn complaints consistent with epigastric pain[.]
2. She had markedly elevated liver enzymes on 5-17-82 and 5-24-82[.]
3. She had 160 systolic on 2 or more occasions while at bedrest 6 hours apart[.]
4. She had 3+ edema.
5. 2+ persistent proteinuria for 2 weeks.
6. 3+ brisk reflexes[.]
These can be indicative of severe pre-eclampsia and according to 'Williams,['] they are[.]
Per Dr. Klam—6-15-89[.]"

Written on the side of exhibit No. 98 is the following:

"7. Sudden or excessive weight gain—9 pounds[.]"

After carefully reviewing the record, it is clear that plaintiffs' exhibit No. 98 was prepared by plaintiffs' counsel over a period of time during Dr. Klam's cross-examination.

Dr. Bennett testified on June 16, 1989. Dr. Bennett is affiliated predominately with defendant Carbondale Clinic. Although Carol's primary attending physician during the majority of her pregnancy was Dr. Joseph Tsung, Dr. Bennett acted as Carol's primary attending physician during her hospitalization in May of 1982 because Dr. Tsung was on vacation at that time.

The hypothetical question at issue and the testimony leading up to the hypothetical question were as follows:

"Q. [by plaintiffs' counsel] Now, Doctor, have I correctly stated your opinion: 'Hyperactive reflexes [also known as "brisk" reflexes] or hyperreflexia are not indications of a worsening case of preeclampsia unless accompanied by clonus, twitching, or seizures'?"

A. [Dr. Bennett] Yes, sir.

* * *

Q. Now, so that we make it clear, those were your views, your opinions and medical views that you acted upon and used and relied upon in observing Carol Granberry and in prescribing treatment or care for her during the time she was under your care. Isn't that correct, sir?

A. That is, yes.

Q. And, Doctor, if it develops that the fact is that hyperactive reflexes or hyperreflexia *are*, indeed, indications of a worsening case of preeclampsia, then would it be fair to say, sir, that you did not adequately evaluate and care for Carol Granberry during the time she was under your care?" (Emphasis added.)

Defense counsel objected, and the court sustained the objection. Plaintiffs claim that the trial court erred in refusing to allow them to ask Dr. Bennett the aforementioned question.

Defendants claim that the hypothetical question suggests that plaintiffs' counsel was referring to evidence that would subsequently be introduced at trial. The practice of permitting an expert witness to answer a hypothetical question based upon facts that have not been previously adduced into evidence, regardless of whether there is a guarantee that such facts will subsequently be produced, was said to be "not desirable" and "strongly to be discouraged." *Jamison v. Lambke*, 21 Ill. App. 3d 629, 636, 316 N.E.2d 93, 98 (1974). Further, whether such practice will be permitted is within the sound discretion of the trial court. *Gibson v. Healy Brothers & Co.*, 109 Ill. App. 2d 342, 353, 248 N.E.2d 771, 776 (1969). If evidence is admitted upon

an assurance that it will later be connected up, it should be excluded upon the failure to establish the connection. *Leonardi v. Loyola University*, 168 Ill. 2d 83, 96, 658 N.E.2d 450, 457 (1995). Plaintiffs claim, however, that Dr. Roger Klam had already testified to the alleged facts or opinions hypothesized.

■ It was formerly the rule in Illinois that an expert witness could only be asked whether the facts stated in the hypothetical question are "*sufficient*," from a medical or surgical point of view, to cause and bring about a certain condition or malady, or he may be asked whether a given condition or malady of a person "*may*" or "*could*" result from and be caused by the facts stated in the hypothetical question. *Fellows-Kimbrough v. Chicago City Ry. Co.*, 272 Ill. 71, 77, 111 N.E. 499, 502 (1916). The *Fellows-Kimbrough* court determined, however, that the physician should not be asked whether or not such facts "*did cause*" and bring about such condition or malady. *Fellows-Kimbrough*, 272 Ill. at 77, 111 N.E. at 502. In 1960, the Illinois Supreme Court changed this rule, and since that time, counsel may also ask whether the condition "did cause" the particular result, as long as the witness is not called upon to decide any controverted fact but is asked to assume the truth of the facts testified to. It is therefore proper to phrase the hypothetical in either form. *Clifford-Jacobs Forging Co. v. Industrial Comm'n*, 19 Ill. 2d 236, 243, 166 N.E.2d 582, 587 (1960).

The assumptions in a hypothetical are proper as long as they are within the realm of direct or circumstantial evidence *or are reasonable inferences from the established facts. Guardian Electric Manufacturing Co. v. Industrial Comm'n*, 53 Ill. 2d 530, 535, 293 N.E.2d 590, 594 (1973). Moreover, the facts suggested in hypothetical questions need not be undisputed but need only be supported by the record, and "[i]n presenting evidence by a hypothetical question, counsel propounding the question has a right to ask it, assuming only the facts as he perceives them to be shown by the evidence." *Carter v. Johnson*, 247 Ill. App. 3d 291, 297, 617 N.E.2d 260, 265 (1993). Opposing counsel may then challenge the controverted facts by presenting his own hypothetical questions to the witness. *Carter*, 247 Ill. App. 3d at 297, 617 N.E.2d at 265. "Facts, data, or *opinions* supported by the evidence *** may be varied in questions asked on cross-examination designed to develop a potentially different opinion of the expert than would prevail if the trier believed a contrary version of disputed facts." (Emphasis added.) M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 705.2, at 554 (5th ed. 1990).

Defendants argue that it is improper to ask a witness to assume a fact in a hypothetical that the witness does not believe to be true.

No Illinois case is cited in support. The case of *Baker v. Gordon*, 759 S.W.2d 87 (Mo. App. 1988), is relied upon. We express no opinion of whether *Baker* accurately states Missouri law. It does not accurately state Illinois law. Illinois law may be found in the most recent pronouncement of our supreme court: "Counsel has a right to ask an expert witness a hypothetical question that assumes facts that counsel perceives to be shown by the evidence. [Citation.] The assumptions contained in the hypothetical question must be based on direct or circumstantial evidence, or reasonable inferences therefrom. [Citation.] The hypothetical question should incorporate only the elements favoring his or her theory, and should state facts that the interrogating party claims have been proved and for which there is support in the evidence. On cross-examination, the opposing party may substitute in the hypothetical those facts in evidence that conform with the opposing party's theory of the case." *Leonardi v. Loyola University*, 168 Ill. 2d 83, 96, 658 N.E.2d 450, 456-57 (1995).

■ We find that there was sufficient evidence in the record to support asking Dr. Bennett the aforementioned hypothetical question. First, Dr. Klam testified that brisk reflexes can be an indication of severe preeclampsia. Second, Dr. Klam stated that brisk reflexes might be an indication of severe preeclampsia. Finally, Dr. Klam testified that brisk reflexes are a warning sign of severe preeclampsia. Hence, plaintiffs' hypothetical question was framed properly, having relied on the inferences from Dr. Klam's testimony. That being the case, Dr. Klam's actual testimony did include the necessary facts to support plaintiffs' counsel asking Dr. Bennett the above-mentioned hypothetical question.

Because the circuit court denied plaintiffs' counsel the opportunity to ask Dr. Bennett the hypothetical question, a question supported by the evidence already admitted, it abused its discretion. The evidence and inferences to be drawn from the evidence were sufficient to support the assumptions stated in the hypothetical question. Further, we believe that this error was prejudicial because the answer to the hypothetical was the very essence of plaintiffs' case. By sustaining defense counsel's objection, the trial judge deprived plaintiffs of the opportunity to establish that Carol's preeclampsia had become severe at least by May 13, 1982, when Susan's brain was still "in reasonably good condition."

Plaintiffs also claim that the trial court erred in refusing to allow plaintiffs to cross-examine Dr. William R. Hamilton from four medical articles published after 1982, the year Susan was born. Plaintiffs state that their purpose in using the post-1982 articles was to "counter Dr. Hamilton's repeated statements that *Carbondale Memorial*

*Hospital's* ultrasound equipment was capable of detecting periventricular leukomalacia in 1982." (Emphasis added.) Plaintiffs claim that "Dr. Hamilton testified that ultrasound was capable of detecting the lesion which eventually caused the baby's cerebral palsy, but that the ultrasound instead indicated that the baby's brain was 'normal,' meaning that 'the brain was put together correctly' and that there were no 'significant intercranial [*sic*] abnormalities.' " Plaintiffs argue that the logical inference is that this negative ultrasound finding meant that there was no lesion in the baby's brain as late as two days after the baby's birth. Plaintiffs claim that this inference "blew to smithereens plaintiffs' theory that the brain lesion developed *before* birth" because the baby had been left too long in a contaminated intrauterine environment.

It is important, for purposes of this issue, to note that Susan's cerebral palsy was caused by a brain lesion known as periventricular leukomalacia. Dr. Hamilton began testifying on July 18, 1989. Dr. Hamilton was, at all relevant times, a pediatrician concentrating in the practice of neonatology. Dr. Hamilton was directly involved in Susan's care from shortly after her birth until she was eight months old. On direct examination, Dr. Hamilton testified that an intracranial ultrasound was performed on Susan on May 26, 1982, when she was two days old. He stated that the examination was "unremarkable," meaning that it was "normal." On July 24, 1989, the following questions were asked of Dr. Hamilton by plaintiffs' counsel:

"Q. And, Doctor, would you also agree, sir, that an ultrasound after birth would not show periventricular leukomalacia?

A. No.

Q. You won't agree with that?

A. No.

Q. Do you have any text there to support that statement, sir?

\* \* \*

A. Yes, Dr. Volpe has an article here in 1982, stating that ultrasound is correlated with the autopsy findings for periventricular leukomalacia.

Q. Would you read \* \* \* what it says, Doctor?

\* \* \*

A. (Reading) 'Ultrasound scanning has been very useful in the evaluation of periventricular white matter injury. Periventricular leukomalacia is visualized especially well when hemorrhagic, although nonhemorrhagic periventricular leukomalacia proved at postmortem examination is also demonstrated effectively.' "

Defendants claim that these questions were not specific to Susan and the ultrasound equipment at Carbondale Memorial Hospital in 1982. While we agree that the question and answer addressed the

capabilities of ultrasound equipment in general, it is clear that Dr. Hamilton's statement regarding ultrasound capabilities in 1982 left the jurors with the inference that the ultrasound equipment at Carbondale Memorial Hospital in 1982 was capable of picking up periventricular leukomalacia. In fact, the next day, on July 25, 1989, plaintiffs' counsel claimed that he was referring specifically to Carbondale Memorial Hospital's equipment when he asked the aforementioned questions. The relevant portion of the record is as follows:

"Q. [by plaintiffs' counsel] All right, Doctor. You cited there was one 1982 article that was cited in Volpe as support for the—for your statement or conclusion that ultrasound in 1982, as done in this hospital, could detect this periventricular leukomalacia. Correct, sir?

A. [Dr. Hamilton] That article was stated that—

Q. Excuse me. My question is that you concluded from that, sir, that the Carbondale Memorial Hospital could detect periventricular leukomalacia with the ultrasound that they had at that time, did you not, sir?

A. I don't think that was the question, Mr. Carr.

Q. Well, Doctor, are you now saying that Carbondale Memorial Hospital did not have the capacity or this ultrasound that they performed at this particular date would not show periventricular leukomalacia? Are you now saying that, sir?

A. No.

* * *

Q. *** All right, is it still your belief, sir, that the ultrasound that they did here, this linear real-time ultrasound, could detect periventricular leukomalacia in Susan?

MR. LYNCH [defense counsel]: Your Honor, I do object, because the question yesterday was a general one and it should be not specific to Carbondale or Susan.

MR. CARR [plaintiffs' counsel]: It was specific to Carbondale. This witness said, and we went through this sonogram—

THE COURT: Well, gentlemen, if we are going to start discussing what the evidence was from yesterday, we will have to send the jury out. The jury will please go out."

Whereupon, the jury was excused and the following proceedings were held outside their presence and hearing:

"MR. CARR: Your Honor, the last 30 minutes yesterday was taken up with going through this ultrasound and with the doctor explaining that this hospital was capable of detecting this lesion. That's exactly what we were talking about. We were discussing this particular ultrasound and his testimony to the effect that it could detect this lesion. Now Mr. Lynch says that wasn't the

testimony. It clearly was the testimony of the doctor. We went through line-by-line here, discussing this particular ultrasound.

MR. LYNCH: I am particularly objecting to any form of any questions and this specific question that implies some change in the doctor's testimony. Mr. Carr asked the doctor a broad question: Can an ultrasound or could an ultrasound in 1982 detect periventricular leukomalacia? And then he just basically dug into a lot of specific questions about what the particular sonogram report showed. Now, you know, the thing that I am objecting to—and Mr. Carr is welcome to inquire as to the doctor's opinions, but the questions that seem to imply that he's changing his answers is what I am objecting to.

MR. CARR: I didn't ask the question that Mr. Lynch said that I asked. I was asking specifically about this ultrasound in my questioning of the doctor, and his interpretation, his views as to the ability of the Carbondale Memorial Hospital to detect periventricular leukomalacia. Mr. Lynch is now making some other objection than what he made in front of the jury. He said there was no evidence that we were discussing this ultrasound. That's what he said when the jury left, and that's what we were discussing yesterday, and that's what we are discussing this morning.

MR. LYNCH: I haven't changed what I said in front of the jury. Mr. Carr did ask a lot of specific questions about the ultrasound report. The original question was: Could an ultrasound in 1982 detect periventricular leukomalacia? And I am not saying that the ultrasound report wasn't discussed, but he was not asked a question which Mr. Carr is now implying that he was, you know. Did Carbondale Memorial Hospital, with this ultrasound in 1982, have the capacity to detect periventricular leukomalacia? That question wasn't asked.

MR. CARR: That question was asked yesterday. The doctor said that they did not have that capacity. We discussed each line here, and it was pointed out that these—this leukomalacia was not demonstrated in this report. That's exactly what the doctor said. The question that started this all off was I asked the doctor to agree that the ultrasound they had at the Carbondale Memorial Hospital could not detect periventricular leukomalacia. He disagreed with that. He would not agree with that. He said, 'No, it would detect it.' And then we took out the ultrasound, and he pointed out that it wasn't detected, and it was his assertion. Now, if he is now saying that he doesn't know whether or not the Carbondale Memorial Radiology Department had the capacity or whether or not this ultrasound could detect it, then he is changing his testimony, because that's clearly what he said yesterday, without a question. And that's the whole reason for this line of ex-

amination today. That's the whole reason that we have these articles, is to find out, clearly, that the Carbondale hospital did not have that capacity and could not do that, as this witness, now that he's read these articles or read some of these articles, is apparently going to agree with me. Or else he is going to say now he has no opinion. But that's clearly what he said yesterday in front of the jury."

The court, after reviewing the record, first paraphrased Dr. Hamilton's testimony from July 24, 1989. The court then decided that plaintiffs' counsel's question *was not an improper question based on the answers that Dr. Hamilton had given the day before,* but the court refused to allow plaintiffs' counsel to cross-examine using post-1982 medical literature. Because Dr. Hamilton left the jurors with the inference that ultrasound at Carbondale Memorial Hospital in 1982 could detect periventricular leukomalacia, we must now determine whether plaintiffs' counsel should have been allowed to impeach Dr. Hamilton's testimony with the post-1982 medical articles.

It is undisputed that when Dr. Hamilton was questioned about the capacity of ultrasound in 1982 to detect periventricular leukomalacia, he referred to a 1987 medical treatise entitled *Neurology of the Newborn* (2d ed. 1987), written by Dr. Volpe. Within this 1987 medical treatise, all but one of the authorities cited by Dr. Volpe were published after the ultrasound performed on Susan on May 26, 1982.

Plaintiffs sought to discredit Dr. Hamilton's reliance upon the authorities cited by Dr. Volpe by confronting him with the 1982 article authored by Volpe. This article appeared in the journal entitled *Pediatrics.* The article discussed an ultrasound performed after the infant's thirty-first day of life. The infant died at 34 days of age. The ultrasound disclosed "a densely echogenic area indicative of hemorrhage." Dr. Hamilton explained that this meant that the ultrasound was detecting accumulations of blood in the brain. Periventricular leukomalacia does not necessarily produce hemorrhaging. In fact, hemorrhage was ruled out as a cause of Susan's periventricular leukomalacia. Dr. Hamilton agreed that the ultrasound machine discussed in the 1982 article written by Dr. Volpe was a rotary scanner that was "more apt to give a better picture" than the linear scanner used on Susan at Carbondale Memorial Hospital in 1982. Hence, plaintiffs were able to demonstrate that the 1982 authority cited in the 1987 medical treatise did not support Dr. Hamilton's suggestion that the ultrasound equipment used at Carbondale Memorial Hospital in 1982 was capable of detecting this condition in Susan.

After plaintiffs' counsel attempted to cross-examine Dr. Hamilton with the post-1982 medical articles, the trial judge sustained defense counsel's objection that it is improper to use post-1982 publications for the purpose of cross-examination in a case involving malpractice allegedly committed in 1982. The trial court relied upon *Karr v. Noel*, 212 Ill. App. 3d 575, 571 N.E.2d 271 (1991), as its basis.

In *Karr v. Noel*, 212 Ill. App. 3d at 583-84, 571 N.E.2d at 277, this court determined that literature containing medical knowledge not available at the time of the alleged malpractice as evidence of deviation from the standard of care at the time of the alleged malpractice was highly prejudicial evidence. Plaintiffs claim, however, that they were not attempting to use the post-1982 articles as proof of malpractice, but rather for the express purpose of impeaching Dr. Hamilton's statement that ultrasound technology in 1982 was capable of detecting periventricular leukomalacia. We agree.

■ After reviewing the record, it is clear that plaintiffs were attempting to use the post-1982 medical articles to show the *diagnostic capabilities* of ultrasound, *not* to show standard of care. While we agree that postevent literature should not be used to show standard of care, it is proper to use postevent literature for other purposes, such as showing the diagnostic capabilities of equipment. Rules of evidence and law must be read and applied with an understanding of the reason for the rule. The reason that medical literature that postdates the alleged malpractice is not admissible is because no physician should have his *conduct* measured by knowledge and standards not in existence at the time the conduct at issue occurred. The diagnostic capabilities of ultrasound equipment were irrelevant to the standard of care issue in this case. If there was a deviation from the standard of care that would subject defendants to liability, that deviation occurred prior to birth. However, the diagnostic capabilities of ultrasound were critical to the issue of when Susan suffered her injury, *i.e.*, before or after birth. If an ultrasound examination performed shortly after birth was capable of showing the presence of periventricular leukomalacia, assuming it was present, and if the examination was negative, that would be persuasive evidence that the injury did not occur prior to birth. But if the test was not diagnostic for the condition, then a normal exam would simply be irrelevant, at least on the question of when the condition developed, because it would neither establish nor refute the existence of the condition. When Dr. Hamilton testified that the test was diagnostic and cited medical literature to support his testimony, it was essential to allow cross-examination to attempt to impeach the doctor with contrary literature, whether that literature was published during, before, or

after 1982. Hence, we believe that the trial court abused its discretion in refusing to allow plaintiffs' counsel the opportunity to cross-examine Dr. Hamilton with the post-1982 medical articles.

We recognize that at a different point in his testimony Dr. Hamilton agreed with the following statement found on an exhibit:

"BASED ON PRESENT-DAY KNOWLEDGE, THE PERIVEN-TRICULAR LEUKOMALACIA WAS PRESENT, IN MY OPINION ON 5-26-82, BUT WAS NOT DETECTED BY THE ULTRA-SOUND PERFORMED ON THAT DATE.

PER DR. HAMILTON
7-25-89"

Defendants claim that by virtue of this concession, plaintiffs' cross-examination with the post-1982 literature would have been merely cumulative. We disagree. We believe that Dr. Hamilton's repeated statement that ultrasound in 1982 could detect periventricular leukomalacia prejudiced plaintiffs' case. The jury heard that there were a total of five medical articles purportedly supporting Dr. Hamilton's suggestion that a 1982 ultrasound might have detected periventricular leukomalacia in Susan. Simply because Dr. Hamilton testified that, in his opinion, the periventricular leukomalacia was present two days after Susan's birth and was undetected by the ultrasound does not remedy the prejudice caused by allowing the doctor's testimony on ultrasound capabilities to go unrefuted and unimpeached. Plaintiffs' counsel should have been allowed to impeach the doctor with respect to each of those articles. This refusal to allow the impeachment constitutes reversible error.

■ We have reviewed Dr. Pulido's contention that these errors do not pertain to the case against her. We agree.

As Dr. Pulido points out, plaintiffs' own expert testified that the injury to Susan Granberry occurred well after Dr. Pulido last saw Carol Granberry. The plaintiffs' expert acknowledged that while the medications prescribed by Dr. Pulido were inappropriate, they neither helped nor hurt Carol or Susan Granberry. The issue of Dr. Pulido's negligence was submitted to the jury, and they found in her favor. After reviewing the evidence, we do not believe that the evidentiary errors that are discussed elsewhere in this decision impacted on the case against Dr. Pulido. Therefore, the verdict in favor of Dr. Pulido is affirmed.

Accordingly, we affirm in part and reverse in part the judgment of the circuit court, and we remand this case to the trial court for a new trial on all issues pertaining to the remaining defendants.

Affirmed in part and reversed in part; cause remanded.

CHAPMAN and RARICK, JJ., concur.