ANTHONY NELSON, a Minor, by Tammy Nelson, his Mother and Next Friend, *et al.*, Plaintiffs-Appellants, v. VINOD P. UPADHYAYA *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—03—2509

Opinion filed September 23, 2005.

Barry D. Goldberg and Barbara D. Klein, both of Goldberg & Goldberg, and David A. Novoselsky and Leslie J. Rosen, both of Novoselsky Law Offices, both of Chicago, for appellants.

Linda E. Spring, of Swanson, Martin & Bell, of Libertyville, and Kay L. Schichtel, of Swanson, Martin & Bell, of Chicago, for appellee Vinod P. Upadhyaya.

Timothy G. Merker, of Tucker, Bower, Robin & Romanek, L.L.C., of Chicago, for appellees Varsha Upadhyaya and V. Upadhyaya, M.D., Ltd.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

Anthony Nelson suffered brain damage due to meningitis shortly after his birth in 1990. He and his mother sued his mother's obstetrician and his pediatrician for medical malpractice, alleging that the obstetrician should have treated his mother with prophylactic antibiotics and the pediatrician should have started treating him with antibiotics much earlier. The defendants contended that they fully complied with the 1990 standard of care. They used postoccurrence literature to support their theory that the standard of care later evolved to require prophylactic antibiotics for a case like plaintiff's. The jury returned a verdict in favor of both defendants.

On appeal plaintiffs challenge the sufficiency of the evidence and the use of postoccurrence literature. Although we find that experts provided sufficient credible support for the verdicts, we find that the trial court erred by permitting the use of postoccurrence literature, unavailable to the doctors at the time of treatment, to aid in interpretation of the applicable standard of care. We reverse and remand for a new trial.

## BACKGROUND

On March 26, 1990, Tammy Nelson went to see her obstetrician, Dr. Varsha Upadhyaya (Dr. Varsha). Tammy, then about seven months pregnant, complained of pain she experienced while urinating. A laboratory test of Tammy's urine revealed that Group B streptococcus (GBS) bacteria had infected Tammy's urinary tract. Dr. Varsha

prescribed an antibiotic, and that antibiotic apparently alleviated the problem.

Tammy came to Christ Hospital on May 23, 1990, around 3:30 a.m. The resident on duty ruptured her bag of waters around 7 a.m. and ordered administration of a drug to stimulate contractions. Dr. Varsha examined Tammy around 9 a.m. Throughout the day nurses charted "normal vital signs" at regular intervals. The nurses did not specify Tammy's temperature at any point between 11:30 a.m. and 11:30 p.m. on May 23, 1990.

Around 7 that evening Dr. Varsha decided that the labor had not progressed adequately. Dr. Varsha performed a cesarean section after 8 p.m. Tammy gave birth to a healthy, full-term infant whom she named Anthony. At 10:30 p.m. a resident notified the pediatrician, Dr. Vinod Upadhyaya (Dr. Vinod), of the birth. Tammy's temperature spiked to 102 degrees around 12:30 a.m. on May 24. The medical chart does not indicate that any resident or nurse informed Dr. Varsha or Dr. Vinod of the temperature. At 3:45 a.m. on May 24, a nurse ordered a complete blood count (CBC) for Anthony.

Dr. Vinod first saw Anthony at 2 p.m. on May 24, 1990. He found a normal, healthy baby with good vital signs. The record of the examination does not include a report of the earlier CBC. At 7:15 p.m. on May 24 a nurse noted that Anthony started moaning. A resident who examined Anthony ordered further tests. At 8:45 p.m. the hospital transferred Anthony to the special care nursery. Tests showed that GBS bacteria had infected Anthony's blood and spinal fluid. He suffered from streptococcal meningitis and septic shock.

The pediatric neurologist who examined Anthony in June 1990 found that Anthony had suffered a watershed ischemic infarct of the brain as a consequence of the meningitis. That is, a lack of blood supply to parts of Anthony's brain led to a stroke.

Anthony survived the meningitis, but later examinations showed certain areas of his brain did not fully recover. Some years later doctors began treating Anthony for attention deficit hyperactivity disorder (ADHD).

In 1994 Anthony and Tammy sued Dr. Varsha and Dr. Vinod for medical malpractice. Plaintiffs alleged that if the doctors had administered appropriate antibiotics prophylactically, beginning some hours before delivery, Anthony would not have contracted meningitis, and he would not have come to suffer from ADHD.

Plaintiffs identified Dr. Heinz Eichenwald as an expert witness on pediatric infectious diseases. Shortly before trial an illness made Dr. Eichenwald unavailable to testify. The court permitted plaintiff to identify a substitute expert on pediatric infectious diseases. Plaintiffs

named Dr. Roger Barkin as the substitute and arranged for a deposition on the eve of trial. Following the deposition defendants moved to bar Dr. Barkin from testifying in plaintiffs' case in chief because he had reviewed far more material than had Dr. Eichenwald and Dr. Barkin held opinions Dr. Eichenwald had not expressed. The court granted the motion to bar Dr. Barkin's testimony.

Before trial defendants sought permission to use literature published after 1990 to show the standard of care in 1990. They sought to use the later literature to show that the standard of care for women in labor continued to evolve through the 1990s. Defendants admit that by the end of that decade, all qualified physicians knew of the need to treat a woman in labor with appropriate antibiotics if she had a history indicating colonization with GBS. Over plaintiffs' strenuous objection, the court permitted defendants to use literature published after 1990 to establish the 1990 standard of care.

In the opinion of plaintiffs' obstetrics expert, Dr. Varsha deviated from the 1990 standard of care when she failed to administer during labor appropriate antibiotics to combat potential GBS infection. She also violated the standard of care when she failed to tell other doctors, including Dr. Vinod, that Tammy had a GBS infection in the third trimester of her pregnancy.

Defendants showed the expert two publications of the American College of Obstetrics and Gynecology (ACOG), one from 1992 and the other from 1996. Both publications acknowledged the prevalence of GBS colonization in pregnant women, and they also acknowledged the danger to the infant from exposure to GBS in the birth process. The publications recommended risk factors the obstetrician should consider when deciding whether to administer prophylactic antibiotics to a woman in labor. The factors included preterm labor, premature rupture of the bag of waters, rupture of the bag of waters more than 18 hours before delivery, a sibling with GBS infection, and maternal fever during labor. The 1996 publication added prenatal colonization with GBS as a risk factor.

According to plaintiff's expert, the ACOG standards applied only to women who, unlike Tammy, had not exhibited any symptoms of GBS infection. The expert admitted that ACOG bulletins from 1992 and 1996 nowhere expressly stated that a third-trimester urinary tract infection required administration of prophylactic antibiotics.

Defendants also cross-examined the expert on articles from 1986 and 1987, including one that said, "[GBS] is a common cause of neonatal sepsis but despite that relationship to neonatal morbidity and mortality, no consensus exists for an approach to prevention." The expert admitted that he knew "there was a controversy" in 1986

concerning the issue. But he explained that even by 1986 "patients would receive antibiotics who were presumptively colonized." Because of Tammy's third-trimester infection, doctors knew that GBS probably colonized Tammy's urinary tract. Dr. Varsha admitted that in 1990 she knew of the probable colonization. A neonatologist explained that in this case there was "invasive disease in the mother with group B strep, and that's one of the persistent risk factors that there wasn't any controversy about."

Dr. Varsha's expert acknowledged that at the time of trial, any competent obstetrician would treat with antibiotics any woman who had recovered from a urinary tract infection shortly before the birth, especially if the woman had suffered a GBS infection. But in 1990, "[GBS] was not considered a risk factor for injury to the fetus." The expert recited the factors listed in the 1992 ACOG publication as grounds for administering prophylactic antibiotics to pregnant women in 1990. The expert found that Tammy exhibited none of the risk factors listed in the 1992 publication. In his opinion, Dr. Varsha complied with the applicable standard of care at all times. He acknowledged that the ACOG publication explicitly stated that it did not "define a standard of care."

The neonatologist who testified for plaintiffs found that Dr. Vinod breached the standard of care by failing to institute appropriate evaluations for Anthony. Dr. Vinod should have obtained the results of the CBC ordered at 3:45 a.m. on May 24, 1990. Because Dr. Vinod did not include any notation concerning the CBC, the expert concluded that he never obtained the results. The CBC, in the expert's opinion, indicated infection. Dr. Vinod should have ordered further testing based on the CBC and he should have started treating Anthony with antibiotics immediately. If Dr. Vinod had done so, Anthony would not have suffered such a severe illness from the infection.

Dr. Jerome Klein, an expert in pediatric infectious diseases, testified that in his opinion the GBS meningitis caused plaintiff to develop ADHD. From 1979 to 1982 Dr. Klein edited "the Red Book," the common name for the Report of the Committee on Infectious Diseases of the American Academy of Pediatrics (AAP). The Red Book provides "guidelines for the practice of pediatrics and infectious diseases." On cross-examination Dr. Klein admitted that the 1995 edition of the Red Book included, as a risk factor that should lead doctors to administer prophylactic antibiotics, asymptomatic GBS colonization of the mother's urinary tract. According to Dr. Klein, the 1988 edition said only:

> "[N]o specific recommendation for the prevention of neonatal GBS disease can be made. Chemoprophylaxis should be considered on an individual *** basis.

\*\*\* [A]dministration of ampicillin to high risk colonized women [(]e.g., those with premature onset of labor, premature rupture of membranes or fever throughout labor[)] has resulted in a decreased transmission of GBS to the infant and decreased rates of infection in infants."

An expert who testified on Dr. Vinod's behalf emphasized that on Dr. Vinod's visual examination, Anthony was a normal, healthy baby, feeding well, with good vital signs. The expert believed that Dr. Vinod requested the CBC information when he found that a nurse had ordered one. The CBC, in the expert's opinion, did not indicate infection, as all values but one showed no abnormality. The CBC as a whole did not signal a need for antibiotics, especially when one views the CBC in the context of Dr. Vinod's physical examination of Anthony. Nothing in the medical record indicates that anyone informed Dr. Vinod of Tammy's third-trimester GBS infection. The standard of care did not require Dr. Vinod to look beyond the record for evidence of potential problems. The hospital staff did not contact Dr. Vinod later that day when Anthony first showed symptoms of infection.

The expert testified that the 1992 AAP guidelines did not mention any special treatment for babies whose mothers had had urinary tract infections. The 1997 guidelines, on the other hand, specifically identified a history of urinary tract infection as an indication to treat a mother in labor with prophylactic antibiotics. The expert also testified that the 1992 Red Book made no recommendations regarding babies of mothers who had had urinary tract infections.

The trial court entered judgment on the jury's verdict in favor of both defendants. The court denied plaintiffs' posttrial motion for judgment notwithstanding the verdict or for a new trial. Plaintiffs appeal.

## ANALYSIS

### Sufficiency of the Evidence

On appeal plaintiffs first claim that we must reverse the verdict because it is at least contrary to the manifest weight of the evidence. See *Maple v. Gustafson*, 151 Ill. 2d 445, 453-54 (1992). Plaintiffs claim that the defense experts in this case, like the plaintiff's expert in *Kemnitz v. Semrad*, 206 Ill. App. 3d 668, 675-76 (1990), had no adequate basis for their opinions, so the jury could not base a verdict on those opinions.

In *Kemnitz* the plaintiff suffered a nerve injury during arm surgery. The plaintiff's expert testified that the standard of care required the defendant, the surgeon, to move the nerve without "undue force." *Kemnitz*, 206 Ill. App. 3d at 671. He testified that the defendant breached the standard of care by using excessive force when

he moved the nerve. But he admitted that nothing in the medical records, apart from the nerve injury itself, supported his finding of excessive force. The trial court refused to instruct the jury on the theory that the defendant used excessive force in surgery.

The appellate court affirmed. Although the court found the expert's testimony sufficient to state a standard of care, the court found no evidence from which a jury could conclude that the defendant violated the standard. The court applied the general principle that a plaintiff cannot establish negligence "through the mere existence of an injury." *Kemnitz*, 206 Ill. App. 3d at 675.

We find that Dr. Varsha's expert, like the plaintiff's expert in *Kemnitz*, adequately testified to a standard of care. The expert testified from his obstetric experience about the state of knowledge and related standards of practice in 1990. But in this case, unlike *Kemnitz*, the expert adequately supported his opinion regarding compliance with that standard. He explained what Dr. Varsha did and how that met all relevant standards at that time. Dr. Varsha properly treated the third-trimester infection. At the time, according to her expert, many doctors did not recognize GBS infection, successfully treated, as a risk factor mandating administration of prophylactic antibiotics during labor.

Plaintiffs emphasize that nurses did not record Tammy's exact temperature during labor, Tammy's temperature rose to 102 degrees following the birth, and that temperature indicated a possible infection. But the record indicates that all of Tammy's vital signs, including her temperature, remained normal throughout labor. No one informed Dr. Varsha when Tammy's temperature spiked a few hours after the delivery. The evidence can support a finding that Dr. Varsha did not act negligently in failing to require recording of Tammy's precise temperature during labor. Dr. Varsha bore no responsibility for failure to tell pediatricians about the elevated postpartum temperature because the staff never informed her of that temperature.

Dr. Vinod's expert also provided sufficient testimony to support a finding that Dr. Vinod complied with the relevant standard of care. His expert found that the CBC was normal, and it did not require Dr. Vinod to administer antibiotics. Dr. Vinod thoroughly examined Anthony and found him in excellent health, with no sign of infection.

Plaintiffs argue that the expert opinions here, like the opinions in *Kleiss v. Cassida*, 297 Ill. App. 3d 165 (1998), and *Dyback v. Weber*, 114 Ill. 2d 232 (1986), rest on mere speculation and conjecture. In *Dyback* the plaintiff's expert testified that the heater the defendant left in the plaintiff's house caused a fire. Our supreme court held the opinion too speculative because the fire could have started in many other ways, and the expert did not give reasons for excluding the

other possible causes. *Dyback*, 114 Ill. 2d at 242-43. In *Kleiss*, the plaintiff's expert testified that defendant's crop spray damaged the plaintiff's crops. He presented no scientific basis for the opinion. The appellate court held the expert's testimony too speculative to support a verdict for the plaintiff. *Kleiss*, 297 Ill. App. 3d at 174.

■ The expert opinions at issue here do not involve causation. The experts testified to the standard of care, basing the testimony on their personal knowledge as practitioners in 1990. They reviewed and interpreted the medical records and explained at length how the record supported their opinions that the defendants complied with the standards of care. We see no grounds for taking from the jury the question of the credibility and reliability of the expert testimony here. See *Doyle v. White Metal Rolling & Stamping Corp.*, 249 Ill. App. 3d 370, 381-82 (1993). The trial court properly rejected plaintiffs' argument that the testimony of defense experts did not adequately support the verdict in favor of defendants.

## II

■ Next, plaintiffs argue that the trial court erred by permitting defendants to use materials published after 1990 in examining witnesses about the standard of care applicable in 1990. We will not reverse a decision concerning the admissibility of evidence unless the trial court abused its discretion and the decision had prejudicial effect. *Stallings v. Black & Decker (U.S.), Inc.*, 342 Ill. App. 3d 676, 683 (2003).

In general, "standards *** not in effect on the date of the [medical treatment] *** are inapplicable to establish a standard of care" for that treatment. *Smith v. South Shore Hospital*, 187 Ill. App. 3d 847, 856 (1989). Defendants persuaded the trial court that the general rule did not apply because defendants sought to use the later materials to show the evolution of the standard of care.

In support defendants cited *Granberry v. Carbondale Clinic, S.C.*, 285 Ill. App. 3d 54 (1996). In that case the trial court disallowed testimony concerning articles published after the alleged medical malpractice. The appellate court reversed, holding that the court abused its discretion by denying the plaintiff the opportunity to introduce evidence from postoccurrence literature concerning the operation of a diagnostic tool the defendant used. The court reasserted the general rule that the trial court should disallow use of "literature containing medical knowledge not available at the time of the alleged malpractice as evidence of deviation from the standard of care at the time of the alleged malpractice." *Granberry*, 285 Ill. App. 3d at 65. The court held that the general rule did not apply because the

"plaintiffs were attempting to use the post-1982 medical articles to show the *diagnostic capabilities* of ultrasound, *not* to show standard of care." (Emphasis in original.) *Granberry*, 285 Ill. App. 3d at 65. Because defendants here used the articles at issue solely to show the standard of care, *Granberry* provides no support for use of the postoccurrence literature here.

In *Karr v. Noel*, 212 Ill. App. 3d 575 (1991), the plaintiff suffered a spider bite in 1982, and the defendant's treatment of the bite left the plaintiff disfigured. The defendant used material published after 1982 to support the theory that the standard of care changed in 1980 and the defendant complied with the applicable standard. The court held:

"[T]he effect of allowing [the defendant's expert] to testify as to his opinion on the proper course of treatment *** based on both pre- and post-1982 articles[ ] was to place irrelevant and highly prejudicial evidence before the jury, and as a result this cause must be remanded for a new trial." *Karr v. Noel*, 212 Ill. App. 3d at 584.

The trial court here allowed defendants to use materials published after 1990 as support for their interpretation of materials available before 1990 concerning the standard of care. But doctors in 1990 could not refer to any of these materials when they actually interpreted the available literature to decide how to treat a patient in 1990.

The use of later materials generated considerable discussion from the experts of the irrelevant issue of the correct interpretation of the materials published after the alleged malpractice. Thus, when defendants presented evidence that later publications advocated prophylactic antibiotics for mothers with probable GBS colonization, plaintiff's experts explained that those later publications referred only to mothers who had not shown any recent symptoms of GBS infection. The issue of the correct interpretation of materials published long after the medical treatment at issue could only distract the jury from proper focus on the issues in the case. See *Rios v. City of Chicago*, 331 Ill. App. 3d 763, 772 (2002). Here, as in *Karr*, the trial court allowed the defense to use irrelevant postoccurrence literature as an aid to interpreting the applicable standard of care. We find that the trial court abused its discretion, and prejudiced plaintiff, by permitting the defense to elicit evidence related to postoccurrence literature.

Defendants' experts adequately substantiated their opinions that the defendants did not violate the 1990 standard of care in their treatment of plaintiff and Tammy. But the trial court abused its discretion when it allowed defendants to introduce postoccurrence literature, unavailable to the treating doctors, as an aid to interpreting the applicable standard of care. Therefore, we reverse the judgment and remand for a new trial. On remand the court will have the opportunity to reconsider its decision to bar the testimony of Dr. Barkin.

Finally, we wish to comment on the exemplary conduct of the parties, their attorneys, the trial court and the jury throughout the lengthy proceedings. The pretrial hearings and the trial here show that persons involved in litigation can conduct themselves civilly and with integrity. We especially appreciate the trial court's concern for producing a good record to facilitate our review. But because we find that the court committed prejudicial error by allowing use of post-occurrence literature to establish the standard of care, we must reverse the judgment and remand for a new trial.

Reversed and remanded.

FITZGERALD SMITH and O'MALLEY, JJ., concur.