FOURTH DIVISION
August 2, 2007

No. 1-06-1296

| | | |
|---|---|---|
| KATHERINE BERGMAN, Special Adm'r of the Estate of Isaac Bergman, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| ROBERT KELSEY, OLLENDORF and KELSEY, LTD., a Professional Corporation, and NORTHWESTERN MEMORIAL HOSPITAL, a Corporation, | ) ) ) ) ) | Honorable Lynn M. Egan Judge Presiding. |
| Defendants-Appellants. | ) | |

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Plaintiff Katherine Bergman filed a medical malpractice suit against Robert Kelsey, Ollendorf and Kelsey, Ltd. and Northwestern Memorial Hospital (defendants) following the death of her newborn son from a Group B streptococcus (GBS) infection. Following a trial, on February 25, 2005, the jury returned a verdict in favor of plaintiff for $1,750,000. The parties agreed that the verdict was subject to a $225,000 setoff for a prior settlement, and the circuit court entered a $1,525,000 judgment against defendants. The circuit court subsequently denied defendants' posttrial motion and defendants now appeal. On appeal, defendants contend that the circuit court erred in denying their request for judgment notwithstanding the verdict (judgment *n.o.v.*) and a new trial. For the following reasons, we affirm.

## I.  BACKGROUND

On April 5, 2001, plaintiff filed an amended complaint at law.  In her complaint, plaintiff alleged that defendants were negligent by failing to screen for GBS during the prenatal period and by failing to diagnose macrosomia (a fetus with significant overgrowth) and timely respond to signs of infection and fetal distress during labor.  Plaintiff's theory about GBS was that a prenatal culture would have identified her as a carrier and prompted prophylactic administration of antibiotics, thereby preventing transmission of the organism to the fetus.  Plaintiff also maintained that defendants permitted plaintiff to attempt a vaginal delivery when they knew or should have known that fetal macrosomia would prevent a safe delivery by that method.

At trial, the parties' experts presented similar testimony about the standard of care applicable to GBS detection.  Each expert witness agreed that the standard of care permitted physicians to choose one of two different options for managing possible GBS infections: the "culture" or the "risk-factor" approach.  One of the primary differences between the two approaches concerns the timing of implementation.  Under the culture approach, a pregnant woman is tested for the organism at 35 to 37 weeks of gestation.  If the culture reveals the woman is positive for GBS, she is treated with antibiotics at the beginning of labor, even in the absence of any sign of infection.  Under the risk-factor approach, treatment is deferred until a risk factor for infection is identified, such as preterm labor, ruptured membranes (when the woman's water breaks) for over 18 hours, a prior child who had GBS, and a maternal fever of 100.4 degrees or more.  All witnesses agreed that both approaches were appropriate and conformed to the standard of care in 1999.  Experts for plaintiff and defendants, Dr. Fields and Dr. Schwartz,

testified that the standard of care on this issue was a "national" standard.

Plaintiff's expert Dr. Richard Fields testified that defendants deviated from the national standard of care in four areas: (1) failing to inform plaintiff of the two acceptable approaches to treat GBS, the approach adopted by defendants, and the risks and alternatives; (2) delaying the start of antibiotics provided to plaintiff; (3) failing to take into account the macrosomia, which should have resulted in certain discussions with plaintiff and a different method of delivery or a different method of delivery sooner; and (4) failing to undertake a cesarean section earlier based upon the abnormalities of the fetal heart tones or the fetal heart tracings.

Dr. Fields testified that when a physician has what is thought to be two equal methods of taking care of a problem in medicine, the standard of care requires the physician to discuss the methods with the patient and help the patient make an informed consent decision as to which method should be adopted in her particular case. Dr. Fields testified that by not engaging plaintiff in such a discussion regarding the two approaches to treat GBS, defendants violated the standard of care. Dr. Fields testified that guidelines issued by the American College of Gynecologists (ACOG) and material from the American Academy of Pediatrics (AAP) stated that such a discussion should take place between a physician and patient. Dr. Fields testified that he based his opinion in part on his experience at Sinai and Sinai-Grace hospitals in Detroit, Michigan.

Plaintiff's exhibits included the ACOG 1996 Committee Opinion on the "Prevention of Early-Onset Group B Streptococcal Disease in Newborns," relied on by Dr. Fields, which included a statement that obstetric providers use "*either* a strategy based on late prenatal culture

1-06-1296

(35-37 weeks) as the primary risk determinant *or* a strategy based solely on clinical risk factors" (Emphasis Added). The ACOG opinion also provided in pertinent part:

> "Patients should be informed of the GBS prevention strategy used. This may be accomplished by providing patient information materials such as the patient information pamphlet produced by ACOG.
>
> If the strategy adopted by the provider is based solely on clinical risk factors, some patients may request that GBS cultures be done. Such requests from informed patients should be honored by obtaining a culture at 35-37 weeks of gestation as recommended by CDC [Center for Disease Control]."

Plaintiff's exhibits also included the 1997 joint "Guidelines for Perinatal Care" by the American Academy of Pediatrics and ACOG, which stated in relevant part:

> "Obstetric providers should adopt a strategy for the prevention of early-onset GBS disease in the newborn. * * *. Women should be informed of the GBS prevention strategy used. If the strategy adopted by the provider is based solely on clinical risk factors, some women may request GBS cultures. Such requests from informed women should be honored by obtaining a culture at 35-37 weeks of gestation."

Dr. Fields also testified that in this case, defendants should have anticipated a long labor because this was plaintiff's first baby, the baby was thought to be large, plaintiff's cervix was not well-effaced, and the baby's head was high in the pelvis. Dr. Fields testified that the average first labor is 18 to 24 hours long and that, under the standard of care, defendants should have

anticipated a labor lasting longer than 18 hours. Dr. Fields testified that 90 % of mothers who delivered a baby infected with GBS tested positive for the organism when a prenatal culture was obtained. Dr. Fields testified that if a physician uses the risk-factor approach to treat GBS, once a labor has gone on longer than 18 hours, the physician administers antibiotics anyway, due to the increased risk of infection to the baby. Dr. Fields testified that plaintiff was nowhere close to delivery when the cesarean section was performed and that the prospects for vaginal delivery were poor because the baby was large. Dr. Fields testified that defendants therefore deviated from the standard of care by not providing plaintiff with antibiotics when plaintiff entered the hospital to induce labor at about 7:15 a.m., on April 5, 2000. As to causation, Dr. Fields testified that the death of the baby could have been avoided if defendants had administered antibiotics upon plaintiff's admission to the hospital.

Dr. Fields also testified that macrosomia is described as a 4,500-gram fetal weight and that prophylactic cesarean section is the standard of care when a physician suspects a 4,500-gram fetus. Dr. Fields testified that about two weeks before plaintiff entered the hospital for an induction, an ultrasound showed a 3,660-gram fetal weight. Dr. Fields testified that babies gain a half pound, or 250 grams, each week that goes by in the last part of pregnancy. Dr. Fields testified that it was reasonably expected that when plaintiff entered the hospital two weeks after the ultrasound, the baby would weigh approximately 4,100 grams. Dr. Fields testified that ultrasound is plus or minus 15 % in accuracy, and therefore, the baby could have been 4,500 grams or more, or less than 4,500 grams if the error was in the other direction. Dr. Fields testified that the standard of care at 4,500 grams required defendants to discuss with plaintiff

having a cesarean section to avoid the risk of shoulder dystocia or damage to the baby's arm.

Dr. Fields testified that the labor and delivery summary filed by one of the nurses at the hospital showed that plaintiff's baby weighed 4,875 grams. Dr. Fields also testified that defendants and other health care providers at the hospital were watching fetal heart tracings during plaintiff's delivery. Heart rate tracing is a device that measures the fetal heart rate in response to maternal contractions. Dr. Fields testified that there were enough abnormalities in the nurse's notes describing the fetal hear tracings to indicate a need for delivery by cesarean section. Dr. Fields testified that the nurse's notes indicated that at 11:45 p.m., "mild variables" were noted, which means that the heartbeat is falling during the contraction and it returns back to its baseline before the contraction ends. At 1:10 a.m., a nurse again noted that variables were continuing, but that the return to baseline was after the contraction was completed, which Dr. Fields testified was a "nonreassuring" sign. Dr. Fields testified that given the fall in the heart rate for a period of time, the variables with the late return to baseline, and no prospect of imminent vaginal delivery, the standard of care required cesarean section intervention at that time. Dr. Fields testified that the nurse's notes at 2:30 a.m. reflected that the variables continued. At 2:50 a.m., the notes indicate that variables continued, but that the fall in the heart rate was occurring after the uterine contraction. Dr. Fields testified that this late deceleration was another non-reassuring sign. The nurse's 2:55 a.m. notes referred to Dr. Kelsey reviewing the heart rate tracing strips. Dr. Fields' opinion with overwhelming medical certainty was that the fetal heart tracings showed abnormalities that should have caused a cesarean section to be performed sooner. Dr. Fields also testified that the death of the baby could have been avoided if an earlier

cesarean section had been performed. Dr. Fields testified that it would have been highly unlikely that the baby would have contracted GBS had a cesarean section delivery been performed because the baby would never have gotten into the vagina and birth canal, where the exposure to the bacteria took place.

Plaintiff's expert Dr. John Seguin testified that based on the information in plaintiff's chart and information about the baby at birth, he believed that there was a deteriorating condition and that it would most likely have been reflected in abnormal fetal heart rate tracings, as many as four or five hours before birth. Dr. Seguin testified that he reviewed the nurses' notes and other information in plaintiff's chart, as well as information from when the baby was born, and plaintiff's and the baby's medical records.

Dr. Seguin testified that a nursing note indicated "mild variables" at 11:45 p.m., which described that there was some decrease in the infant's heart rate not directly associated with a uterine contraction. Dr. Seguin identified a second note at 12:30 a.m., in which a nurse wrote "continuing to have mild to moderate variables." Dr. Seguin testified that "moderate" means more decreases in heart rate. He testified that a third nurse notation at 1:10 a.m. indicated continuing variables as more progression of a problem that was getting more prominent in the face of a fever that plaintiff developed by 10:30 p.m. Dr. Seguin testified that his opinion was that the baby contracted the GBS organism at or about the time that plaintiff's fever was first noted.

Dr. Seguin also identified other evidence which he testified indicated an ongoing process depicting fetal distress. Dr. Seguin testified that the blood gas sample taken from the umbilical

vein when the baby was born was "severely abnormal," which he believed indicated that there was an ongoing hypoxic (low oxygen) level to the baby's tissues developing over time, probably several hours. Dr. Seguin testified that this was not a sudden issue, but the culmination of a continuing process. Dr. Seguin testified that the baby's condition after birth indicated that it was "severely ill" and that this was not just a recent event prior to delivery. Dr. Seguin explained that the "Apgar" scores which reflected the baby's condition at birth were zero, indicating an ongoing insult that developed over time rather than a sudden event.

Dr. Seguin testified that the record showed that plaintiff had a temperature of 101 degrees at about 10:30 p.m. and was given antibiotics at about 12 midnight. Dr. Seguin testified that clinical trials and treatment of GBS has shown that there is an additional risk at either 12 or 18 hours of ruptured membranes for the infant getting sick. Dr. Seguin testified that in the context of plaintiff being in labor for about 14 hours, the risk of infection to the baby increased as the time of ruptured membranes continued. Dr. Seguin testified that plaintiff had ruptured membranes at about 7 a.m., and 18 hours after that would have been at about 1 a.m. Dr. Seguin testified that the earlier antibiotics are provided to a baby with GBS, the better the expected outcome. Dr. Seguin testified that had plaintiff received antibiotics upon her admission to the hospital, the death of the baby could have been prevented. Dr. Seguin testified that had plaintiff been cultured prenatally, she would have been shown to be a GBS carrier. Dr. Seguin testified that literature states that more than 90 % of mothers of babies who had GBS tested positive when they were cultured at 34 to 36 weeks of gestation. In 1999, if a mother was cultured and tested positive for GBS, the mother would be administered antibiotics at the time of admission to the

hospital. Dr. Seguin also testified that an earlier delivery by either route would have improved the baby's chances of survival in this case.

Sherri Lee Haskins testified that she was a labor and delivery nurse and cared for plaintiff at the hospital on April 5, 1999. Haskins testified to the notations made during the evening nursing shift which culminated in the baby's birth. Haskins testified to the increasing fetal heart rate baseline noted in her records; a change in the long-term variability of the tracings beginning at 1:10a.m.; a prolonged five-minute deceleration in the tracings noted at 12:08 a.m.; continuing variables in the tracings during the early morning hours; specific temperature recordings documenting a maternal fever throughout the night; and the administration of fever-reducing medications.

Defendants' experts all denied that the standard of care required a discussion with the patient about the GBS strategy adopted by her physician and there was no dispute at trial that defendants adopted the "risk-factor" approach without the sort of discussion described by Dr. Fields. Plaintiff testified that she would have chosen the culture approach if defendants advised her of this option.

Defendants' expert Dr. Stanford Shulman testified that there are many different GBS strains and that plaintiff's strain was very virulent, replicating at a tremendous rate. Dr. Shulman testified that the baby in this case was "very, very severely affected by this very aggressive, overwhelming infection" and the baby died from "overwhelmingly very severe Group B streptococcal infection sepsis." Dr. Shulman testified that in some instances, such as in this case, no amount of antibiotics would overcome a devastating infection to the baby. Dr. Schulman

testified that the baby's death was unpredictable and unknowable. Dr. Shulman testified that there would be no way at all to know or anticipate this virulent strain of GBS and the kind of outcome in this case.

Defendants' expert Dr. George Wendel testified that he believed that Dr. Kelsey conformed to the standard of care in all respects. Dr. Wendel testified that the standard of care in 1999 did not require Dr. Kelsey to inform plaintiff of the culture approach and risk-factor approach and ask her to decide which approach she wanted him to follow. Dr. Wendel testified that the standard of care did not require Dr. Kelsey to perform a cesarean section any sooner than he did at approximately 4:30 a.m., on April 6, 1999. Dr. Wendel also testified that the standard of care did not require Dr. Kelsey to offer a cesarean section based on the fact that the baby's estimated fetal weight was 4,000 grams. Dr. Wendel testified that the baby was macrosomic at birth, but he did not think that anyone knew the baby was macrosomic at the time plaintiff went into labor. Dr. Wendel's opinion was that the baby died from overwhelming virulent GBS infection. Dr. Wendel also testified that had plaintiff received a cesarean section before she went into active labor, the baby would never have developed GBS.

Dr. Wendel testified that the standard of care in 1999 required the physician to choose and apply either the culture approach or the risk-factor approach. Dr. Wendel testified that it was reasonable for Dr. Kelsey to select the risk-factor approach and that he used the risk-factor approach appropriately in this case. The first risk factor that developed was plaintiff's fever, Dr. Kelsey then diagnosed chorioamnionitis (an inflammation of linings in the uterus), and Dr. Kelsey began administering broad-spectrum, very powerful antibiotics.

Dr. Wendel testified that the chance of culturing women is variable because some women shed the bacteria all of the time, and most women shed it intermittently. Dr. Wendel testified that based on studies, data would support a determination that if plaintiff had been GBS-positive when she gave birth at 41 weeks, if she had been cultured at 35 weeks, 6 weeks before and if she were a typical patient, she would have cultured negative.

Defendants' expert Dr. Jeremy Marks testified that the baby died because of overwhelming GBS infection, which is an infection that is so large that the baby is unable to fight it despite antibiotics and has a high likelihood of death. Dr. Marks testified that the baby's death was not preventable.

Defendant Dr. Kelsey testified that he relied on the 1996 ACOG opinion in determining the approach to adopt relative to GBS infections and to establish the standard of care. Dr. Kelsey testified that the baby died from a GBS infection and conceded that it was transmitted from plaintiff during labor. He also conceded that plaintiff was most likely a GBS carrier before she went into labor. Dr. Kelsey testified that if plaintiff had been cultured and shown to have been positive, he would have prescribed antibiotics for her as soon as she was admitted to the hospital. However, Dr. Kelsey testified that because plaintiff had such a virulent strain of GBS, the prophylactic administration of antibiotics would not have prevented the baby's death. Dr. Kelsey also disputed that 90 % of mothers who delivered a baby infected with GBS tested positive for the organism when a prenatal culture was obtained. Dr. Kelsey testified that "there is plenty of literature showing limitations of culture" and "there [are] a number of problems with the culture approach in particular." Dr. Kelsey also testified that he estimated the fetal weight of plaintiff's

baby before delivery to be 4,000 grams and testified that he believed plaintiff was going to have a very large baby.

Following closing arguments and deliberations, the jury returned a verdict in favor of plaintiff in the amount of $1,750,000, which the parties agreed was subject to a $225,000 setoff. On May 6, 2006, the circuit court denied defendants' posttrial motion and defendants now appeal.

## II. ANALYSIS

### A. Defendants' Request for Judgment *N.O.V.*

Defendants contend on appeal that the circuit court erred in denying their request for judgment *n.o.v.* where there was no basis for any of plaintiff's theories of liability.

" ' In a medical malpractice action, a plaintiff must prove: (1) the proper standard of care by which to measure the defendants' conduct; (2) a negligent breach of the standard of care; and (3) the resulting injury proximately caused by the defendants' lack of skill or care.' " Clayton v. County of Cook, 346 Ill. App. 3d 367, 384 (2004), quoting Susnis v. Radfar, 317 Ill. App. 3d 817, 826 (2000).

A judgment *n.o.v.* presents a question of law that appellate courts review *de novo*. Alwin v. Village of Wheeling, 371 Ill. App. 3d 898, 910-11 (2007), citing Knauerhaze v. Nelson, 361 Ill. App. 3d 538, 547 (2005). A judgment *n.o.v.* should be granted " 'only when all the evidence, viewed in a light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict could stand based on the evidence.' " Alwin, 371 Ill. App. 3d at 911, quoting Knauerhaze, 361 Ill. App. 3d at 547. Our supreme court has further described the standard in

1-06-1296

Maple v. Gustafson, 151 Ill. 2d 445, 452-53 (1992):

> "A trial court cannot reweigh the evidence and set aside a verdict merely because
>
> the jury could have drawn different inferences or conclusions, or because the court
>
> feels that other results are more reasonable. [Citations.] Likewise, the appellate
>
> court should not usurp the function of the jury and substitute its judgment on
>
> questions of fact fairly submitted, tried, and determined from the evidence which
>
> did not greatly preponderate either way." Maple, 151 Ill. 2d at 452-53.

"Thus, the standard for obtaining a [judgment *n.o.v.*] is a 'very difficult standard to meet' and

[is] limited to 'extreme situations only.' " [Citations.]" Alwin, 371 Ill. App. 3d at 911, quoting

Knauerhaze, 361 Ill. App. 3d at 548.

### 1. Standard of Care Relating to the Two Approaches to GBS Detection

Defendants first assert that the circuit court erred in denying their request for judgment

*n.o.v.* where there was no basis for plaintiff's claim that the standard of care required Dr. Kelsey

to inform plaintiff of the two approaches to GBS and ask her to chose between them. Defendants

argue that the sources cited by Dr. Fields do not support his opinion that the standard of care

required such a discussion between Dr. Kelsey and plaintiff.

The record shows that there was no challenge to Dr. Fields' competence to testify and Dr.

Fields presented testimony that when a physician has what is thought to be two equal methods of

taking care of a problem in medicine, the standard of care required the physician to discuss the

methods with the patient and help the patient make an informed consent decision as to which

method should be adopted in her particular case. Dr. Fields testified that by not engaging

-13-

plaintiff in such a discussion regarding the two approaches to treat GBS, Dr. Kelsey violated the standard of care. Dr. Fields testified that guidelines issued by the American College of Gynecologists (ACOG) and material from the American Academy of Pediatrics (AAP) state that such a discussion should take place between a physician and patient. Dr. Fields also testified that he based his opinion in part on his experience at Sinai and Sinai-Grace hospitals in Detroit, Michigan. Defendants disputed Dr. Fields' testimony about the standard of care. On cross-examination, defendants presented guidelines from the Detroit hospitals to impeach Dr. Fields' testimony. Dr. Fields testified on cross-examination that the guidelines defendants presented indicated that both approaches for the prevention of GBS infection in newborns were acceptable. Dr. Fields testified that while the guidelines did not mention informing the patient about the two approaches and asking the patient to decide, the guidelines were not the standard of care. Defendants also presented expert testimony denying that the standard of care required such a discussion between patient and physician, and defendants further argued that a 1996 ACOG opinion did not mention patient choice.

The record shows that both parties offered conflicting expert testimony relating to the proper standard of care and defendants' alleged breach thereof. Thus, the conflicting testimony was sufficient to raise a question of fact to be decided by the jury and this court will not substitute its judgment for that of the jury and reweigh the credibility of the witnesses. Maple, 151 Ill. 2d at 452-53; see also Schuchman v. Stackable, 198 Ill. App. 3d 209, 222 (1990) (the jury is uniquely qualified to resolve conflicting medical testimony concerning the applicable standard of care and a defendant's breach of that standard); Sinclair v. Berlin, 325 Ill. App. 3d 458, 472

(2001) (it is the jury's duty to consider the conflicting evidence and resolve the discrepancies). Further, the record shows that defendants at trial stipulated that based on Dr. Fields' testimony "there is sufficient evidence in the record to support the giving of a jury instruction that contains an issue about whether Dr. Kelsey violated the standard of care by not having the Fields type discussion about the two different strategies and allowing the patient to choose."

We also note that a general verdict was entered in the instant case. Under section 2-1201(d) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1201(d) (West 2000)), a general verdict can be sustained on any of several bases of liability and will not be reversed due to the impairment of one of the theories. Elam v. Lincoln Electric Co., 362 Ill. App. 3d 884, 890 (2005). Therefore, even if plaintiff's alternative theories should not have been presented to the jury, plaintiff still could have recovered under the separate theory of defendants' breach of the standard of care relating to discussing the two different strategies of treating GBS infections with plaintiff. We will nonetheless consider defendants' argument that plaintiff's alternative theories of liability should not have been submitted to the jury.

### 2. Standard of Care Relating to Prophylactic Antibiotic Treatment

Defendants next assert that there was no basis for plaintiff's theory that the standard of care required Dr. Kelsey to give plaintiff antibiotics upon admission to the hospital. Defendants argue that their expert witness, Dr. Wendel, testified that "I've never heard of that," and that the risk-factor approach did not require Dr. Kelsey to give antibiotics to plaintiff at any time before she developed a fever.

The record shows that plaintiff's expert Dr. Fields testified that Dr. Kelsey should have

anticipated a long labor because this was plaintiff's first baby, the baby was thought to be large, plaintiff's cervix was not well-effaced, and the baby's head was high in the pelvis. Dr. Fields testified that the average first labor is 18 to 24 hours long and that, under the standard of care, defendants should have anticipated a labor lasting longer than 18 hours. Dr. Fields testified that if a physician uses the risk-factor approach to treat GBS, once a labor has gone on longer than 18 hours, the physician administers antibiotics anyway. Dr. Fields testified that defendants deviated from the standard of care by not providing plaintiff with antibiotics when plaintiff entered the hospital to induce labor and that the death of the baby could have been avoided if defendants had administered antibiotics upon plaintiff's admission to the hospital. Defendants' expert Dr. Wendel testified that it was reasonable for Dr. Kelsey to select the risk-factor approach and that he used the risk-factor approach appropriately in this case. The first risk factor that developed was plaintiff's fever, Dr. Kelsey then diagnosed chorioamnionitis (an inflammation of linings in the uterus), and Dr. Kelsey began administering broad-spectrum, very powerful antibiotics. This conflicting evidence regarding the standard of care for administering antibiotics was properly submitted to the jury, and this court will not usurp the function of the jury and substitute its judgment for that of the jury. Maple, 151 Ill. 2d at 452-53; Schuchman, 198 Ill. App. 3d at 222; Sinclair, 325 Ill. App. 3d at 472.

### 3. Standard of Care Relating to Macrosomia

Defendants next contend that judgment *n.o.v.* was proper in this case because Dr. Kelsey did not breach the standard of care regarding macrosomia and even if Dr. Kelsey had offered to perform a cesarean section to respond to macrosomia, there was no evidence that plaintiff would

1-06-1296

have accepted that option.

The record shows that the issue submitted to the jury involved whether defendant "failed to diagnose fetal macrosomia prior to and at the time of plaintiff's hospitalization, when he knew or should have known that the condition was present and would require a [cesarean] section procedure for the safe delivery of the baby." Dr. Fields and Dr. Kelsey both testified at trial that 4,500-grams represented the current medical thinking as to what constituted a macrosomic baby. Dr. Fields testified that prophylactic cesarean section is the standard of care when a physician suspects a 4,500 gram fetus. Dr. Fields estimated the fetal weight of plaintiff's baby to be 4,100 grams, while Dr. Kelsey estimated the baby's weight at 4,000 grams. Dr. Fields also testified that there was a 15 % error rate on ultrasounds and that an additional 500-gram weight gain could have been expected between the time of plaintiff's ultrasound and delivery. Dr. Fields and Dr. Kelsey testified that plaintiff's baby was above the 4,500 grams, constituting macrosomia, at birth. Dr. Fields and defendants' expert, Dr. Wendel, both testified that had plaintiff received a cesarean section before she went into active labor, the baby would never have developed GBS. Dr. Fields' opinion was that Dr. Kelsey deviated from the standard of care by failing to take into account the macrosomia, which should have resulted in discussions with plaintiff about a cesarean section at an earlier time. However, Dr. Wendel testified that the standard of care did not require Dr. Kelsey to perform a cesarean section any sooner than he did. This conflicting testimony was sufficient to raise a question of fact to be decided by the jury relating to the standard of care regarding macrosomia and Dr. Kelsey's alleged breach thereof. Maple, 151 Ill. 2d at 452-53; Schuchman, 198 Ill. App. 3d at 222; Sinclair, 325 Ill. App. 3d at 472. There was

no evidence in this case that plaintiff would have refused an earlier cesarean section had Dr. Kelsey discussed such an option with her and, contrary to defendants' assertion, such a factor is not determinative of whether Dr. Kelsey complied with the standard of care in this case.

Defendants also contend that plaintiff's claim that Dr. Kelsey breached the standard of care regarding macrosomia is irrelevant where plaintiff failed to establish proximate cause where GBS was not a foreseeable result of any negligent treatment of macrosomia.

"Proximate cause is one of three elements a plaintiff must prove to succeed in a negligence action: (1) the defendant[s] owed a duty of care; (2) the defendant[s] breached that duty; and (3) the plaintiff's resulting injury was proximately caused by the breach." Hooper v. County of Cook, 366 Ill. App. 3d 1, 6 (2006). The issue of the existence of proximate cause is ordinarily determined by the jury. Knauerhaze, 361 Ill. App. 3d at 548. "There are two requirements for a showing of proximate cause: cause in fact and legal cause." Hooper, 366 Ill. App. 3d at 7. Defendants, here, argue that Dr. Kelsey's actions were not the legal cause of injury. Legal cause presents a question of foreseeability. Legal cause is established if an injury was foreseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct. Knauerhaze, 361 Ill. App. 3d at 549.

"A plaintiff must generally prove the elements of a medical negligence cause of action through medical expert testimony." Knauerhaze, 361 Ill. App. 3d at 549. "In order to sustain the burden of proof, a plaintiff's expert must demonstrate within a reasonable degree of medical certainty that the defendant's breach in the standard of care is more probably than not the cause of the injury." Knauerhaze, 361 Ill. App. 3d at 549. "A plaintiff does not need to present

-18-

unequivocal or unqualified evidence of causation but can meet [her] burden through the introduction of circumstantial evidence from which a ' "jury may infer other connected facts which usually and reasonably follow according to *** common experience." ' [Citation.]" Knauerhaze, 361 Ill. App. 3d at 549, quoting Thacker v. UNR Industires, Inc., 151 Ill. 2d 343, 357 (1992). The weight, sufficiency and credibility assessed to medical expert testimony is within the province of the jury, as is, ultimately, the resolution of evidentiary conflicts with respect to the factual question of proximate cause. Knauerhaze, 361 Ill. App. 3d at 550.

Here, Dr. Fields testified that the standard of care at 4,500 grams required defendants to discuss with plaintiff having a cesarean section to avoid the risk of shoulder dystocia or damage to the baby's arm. Dr. Fields testified that plaintiff was nowhere close to delivery when the cesarean section was performed and that the prospects for vaginal delivery where poor because the baby was large. Dr. Fields also testified that prolonged rupture of membranes longer than 18 hours, is one of the factors for GBS transmission to the baby. As a result of the increased risk of infection to the baby, Dr. Fields testified that prophylactic antibiotics should have been administered to plaintiff because it should have been anticipated that plaintiff would have a long labor because this was plaintiff's first baby, the baby was thought to be large, plaintiff's cervix was not well-effaced, and the baby's head was high in the pelvis. Dr. Fields also testified that the death of the baby could have been avoided if an earlier cesarean section had been performed. Dr. Fields explained that it would have been highly unlikely that the baby would have contracted GBS had a cesarean section delivery been performed because the baby would never have gotten into the vagina and birth canal, where the exposure to the bacteria took place. Dr. Seguin also

testified that an earlier delivery by either route would have improved the baby's chances of survival in this case.

Defendants' experts all testified that Dr. Kelsey complied with the standard of care and that the baby's death was not foreseeable. Dr. Shulman testified that in some instances, such as in this case, no amount of antibiotics would overcome a devastating infection to the baby. Dr. Schulman testified that the baby's death was unpredictable and unknowable. Dr. Shulman testified that there would be no way at all to know or anticipate this virulent strain of GBS and the kind of outcome in this case. Dr. Wendel testified that the standard of care did not require Dr. Kelsey to perform a cesarean section any sooner than he did at approximately 4:30 a.m., on April 6, 1999. Dr. Wendel also testified that the standard of care did not require Dr. Kelsey to offer a cesarean section based on the fact that the baby's estimated fetal weight was 4,000 grams. Dr. Wendel testified that the baby was macrosomic at birth, but he did not think that anyone knew the baby was macrosomic at the time plaintiff went into labor.

While defendants disputed the testimony of Dr. Fields and Dr. Seguin regarding the standard of care and proximate cause of injury, such disputes are the type that juries are expected to resolve through weighing the relative merit of the experts and their positions. Knauerhaze, 361 Ill. App. 3d at 550. Therefore, it was within the jury's purview to give greater weight to plaintiff's experts' opinions than to those of defendants expert's. Keeping in mind the standard applicable to expert testimony, and the standard of review applicable to an appeal of the denial of judgment *n.o.v.*, we cannot say that the jury's determination on the issue of cause in fact was unfounded.

4. Testimony Regarding Fetal Heart Tracings to Show Hostile Environment

Defendants next argue that there was no basis for plaintiff's claim that Dr. Kelsey should have performed a cesarean section earlier because the fetus was in a hostile environment, where the opinions of Dr. Fields and Dr. Seguin were based on speculation regarding fetal heart tracings that they never actually saw.

As the circuit court noted in its order denying defendants' posttrial motion, this argument is identical to the one raised in defendants' motion *in limine* number five, which sought to bar expert testimony about the fetal monitor strips. The basis of that motion was the fact that the fetal monitor strips had been lost before any experts were able to review them, thereby rendering any expert opinion about them "glorified guesswork." After a hearing on defendants' motion, the circuit court denied the motion as it related to Dr. Fields, but took the matter under advisement as to Dr. Seguin pending review of his deposition testimony. The record shows that when the circuit court raised the matter on the following day to address the portion of the matter taken under advisement, defense counsel declared that the motion was withdrawn. The following colloquy occurred:

"THE COURT: All right. I also took a portion of defendants' motion *in limine* number five under advisement –

[DEFENSE COUNSEL]: Your Honor, we're going to withdraw all that.

THE COURT: Okay.

[DEFENSE COUNSEL]: I might as well get him to testify based on that so we'll

-21-

withdraw that.

THE COURT: Okay.  So motion *in limine* number five is withdrawn."

Defendants waived this issue by not only withdrawing their motion *in limine*, but by failing to renew their objection when the evidence was offered at trial.  "Timeliness requires that objections to evidence be made at the time the evidence is offered or as soon as grounds for the objection become apparent."  Spurgeon v. Mruz, 358 Ill. App. 3d 358, 360 (2005).  "A party who, prior to trial, unsuccessfully moves to bar certain evidence, must object again to the evidence when it is offered."  Spurgeon, 358 Ill. App. 3d at 360-61.  Although defendants initially filed a motion *in limine* to bar expert testimony relating to the fetal heart monitor strips, defendants withdrew their motion and failed to voice a contemporaneous object when the issue was addressed at trial.  The record shows that defendants failed to object when the fetal heart monitor strips were addressed in plaintiff's opening statement or when plaintiff elicited testimony on the subject from Dr. Fields and Dr. Seguin.  The record also shows that defendants also failed to object when defendants' own experts, Dr. Wendel and Dr. Marks, were cross-examined about the fetal heart monitor strips.

Waiver aside, the record also shows that defendants injected evidence regarding the fetal heart monitor strips into the trial during the cross-examination of Dr. Fields and Dr. Seguin, as well as during the direct testimony of their own expert, Dr. Wendel.  Because defendants participated in the line of questioning and did not object to the questions relating to the fetal heart monitor strips now complained of, defendants are prohibited from challenging the alleged error on appeal.  See Rub v. Consolidated Rail Corp., 331 Ill. App. 3d 692, 706 (2002).

Furthermore, we find that defendants' basis for objecting to the testimony is without merit. While the actual fetal heart rate monitor strips were unavailable, there was reliable foundation from the expert testimony about the status of the baby *in utero*. Several witnesses, including Haskins, Dr. Fields, and Dr. Seguin, testified that the nurses' notes and plaintiff's chart contained numerous entries which documented the fetal heart rates and provided descriptive language about the heart patterns on the actual strips. This documentation was created at the time the actual fetal heart monitor strips were generated. Dr. Fields' opinion was based on the nurses' notes and he concluded that the fetal heart tracings as documented in the nurses' notes showed abnormalities that should have caused a cesarean section to be performed sooner. Dr. Fields also testified that the death of the baby could have been avoided if an earlier cesarean section had been performed. Dr. Seguin testified that based on the information in the baby's chart, the nursing notes and information about the baby at birth, he believed that there was a deteriorating condition that would most likely have been reflected in abnormal fetal heart rate tracings, as many as four or five hours before birth. We cannot say that the circuit court erred by denying defendants' motion for judgment *n.o.v.* on this basis.

### B. Defendants' Request for a New Trial

### 1. Manifest Weight of the Evidence

Defendants next contends that this court should grant a new trial where the jury verdict was against the manifest weight of the evidence, "consisting almost entirely of Dr. Fields' far-fetched testimony and fanciful theories."

1-06-1296

"A new trial should be granted only when the verdict is contrary to the manifest weight of the evidence." York v. Rush-Presbyterian-St. Luke's Medical Center, 222 Ill. 2d 147, 178 (2006). "A verdict is contrary to the manifest weight of the evidence when the opposite conclusion is clearly evident or when the jury's findings prove to be unreasonable, arbitrary and not based upon any of the evidence." York, 222 Ill. 2d at 179. Defendants do not suggest that the findings of the jury were unreasonable or arbitrary, but request a new trial because they argue that Dr. Fields' testimony was less than credible. However, "credibility determinations and the resolution of inconsistencies and conflicts in testimony are for the jury." York, 222 Ill. 2d at 179. After carefully considering the evidence, the jury chose to accept plaintiff's position. We find that a review of the evidence at trial establishes that the jury's verdict is not against the manifest weight of the evidence.

This court previously set forth the evidence in support of the jury's verdict in addressing defendants' request for judgment *n.o.v.* and need not repeat that evidence here. The record reveals that Dr. Fields' testimony was based in part on the 1996 ACOG bulletin, which defendant Dr. Kelsey admitted established the standard of care in this case. Dr. Fields was also not plaintiff's only expert witness to testify regarding the standard of care and defendants' alleged breach thereof. In addition, defendants' own experts offered standard of care testimony that in some instances did not significantly differ from the opinions offered by Dr. Fields. It was the jury's function to resolve any conflicts in the evidence and after careful consideration, we cannot say that the jury's verdict was against the manifest weight of the evidence.

2. Evidentiary Rulings

-24-

1-06-1296

a. Testimony Regarding Fetal Heart Monitoring

Defendants next contends that they are entitled to a new trial because the circuit court erred in allowing Dr. Fields and Dr. Seguin to speculate regarding what the missing fetal heart monitor strips would have shown. As previously discussed, defendants waived this contention by withdrawing their motion *in limine* and failing to object when the evidence was offered at trial (Spurgeon, 358 Ill. App. 3d 358); defendants are prohibited from challenging this alleged error where they participated in the line of questioning and did not object to the questions relating to the fetal heart monitor strips now complained of (Rub, 331 Ill. App. 3d at 706); and despite the absence of the fetal heart monitor strips, there was sufficient evidence for the expert testimony about the status of the baby *in utero* to permit such testimony. Thus, defendants are not entitled to a new trial on this basis.

b. Postevent Literature

Defendants next contend that the circuit court erred by permitting plaintiff to use post-event medical literature. Defendants claim error over the use of two medical textbooks published in 2001 and 2004, as well as a technical bulletin published by ACOG. Defendants argue that use of these materials violated the rule prohibiting the introduction of postevent evidence in order to prove negligence. See Smith v. South Shore Hospital, 187 Ill. App. 3d 847 (1989).

This court will not reverse a decision concerning the admissibility of evidence unless the circuit court abused its discretion and the decision had prejudicial effect. Nelson v. Upadhyaya, 361 Ill. App. 3d 415, 422 (2005). In general, " 'standards *** not in effect on the date of the

1-06-1296

[medical treatment] *** are inapplicable to establish a standard of care' " for that treatment. Nelson, 361 Ill. App. 3d at 422, quoting Smith, 187 Ill. App. 3d at 856.

The 2002 ACOG opinion discussed studies that evaluated the effectiveness of prenatal cultures in identifying the GBS organism. Based on these studies, ACOG concluded that "the culture-based approach is superior to the risk-based approach" and "the risk of having an infant with early onset GBS was significantly lower in the culture group." Although the ACOG document was not published until 2002, the study upon which these conclusions were based analyzed data generated by births that occurred in 1998 and 1999. The 2001 text by Remington & Klein concluded that prenatal cultures were effective in identifying and preventing 85 % to 90 % of GBS infections and the 2004 text by Feign & Cherry discussed the statistical probability of preventing GBS infection by instituting earlier antibiotic therapy.

After reviewing the record, it is clear that plaintiff was attempting to use the post-1999 medical literature to show the diagnostic capability and statistical probability of detecting and avoiding GBS infection with use of prenatal cultures and early administration of antibiotics, not to show the standard of care. In Granberry v. Carbondale Clinic, S.C., 285 Ill. App. 3d 54 (1996), this court approved such limited use of postevent medical literature.

In Granberry, plaintiffs filed suit against several physicians, alleging negligent treatment of the plaintiff mother's preeclampsia, resulting in the birth of a premature child who suffered from multiple health problems, including a brain lesion. An essential part of plaintiffs' burden of proof, therefore, was the need to demonstrate that the brain lesion developed *in utero* as a result

-26-

of the mother's preeclampsia. Granberry, 285 Ill. App. 3d at 56. Defendants responded to plaintiffs' theory with testimony by one of the defendants that the equipment used to obtain an ultrasound of the baby's brain two days after birth was capable of detecting such a brain lesion and that the ultrasound actually obtained showed no abnormalities. When plaintiffs' counsel challenged the defendant about his testimony regarding the diagnostic capabilities of the ultrasound, the defendant cited medical literature to support his assertions. This testimony refuted plaintiffs' theory, but the circuit court held that plaintiffs' counsel was not permitted to rebut the defendant's testimony with postoccurrence literature, even though the literature directly contradicted the defendant's testimony about ultrasound capabilities. This court found this to be reversible error. Granberry, 285 Ill. App. 3d at 64-66.

In Granberry, we reasserted the general rule that the circuit court should disallow use of "literature containing medical knowledge not available at the time of the alleged malpractice as evidence of deviation from the standard of care at the time of the alleged malpractice." Granberry, 285 Ill. App. 3d at 65. Even though the literature in that case was published after the alleged negligence, this court found that the general rule did not apply because plaintiffs were not attempting to use the literature as proof of malpractice, but rather to show the diagnostic capabilities of the equipment. We held that the failure to allow this use warranted reversal because defendants' position on causation made it "essential to allow cross-examination to attempt to impeach the [defendant] with contrary literature, whether that literature was published during, before, or after [the alleged malpractice]." Granberry, 285 Ill. App. 3d at 65-66.

Here, as in Granberry, the circuit court allowed plaintiff to use the medical literature to

show the diagnostic capabilities of detecting and avoiding GBS infection, rather than to show the standard of care. Plaintiff's causation theory was that the failure to obtain a prenatal culture prevented detection of GBS in plaintiff and allowed transmission of the organism to the fetus, ultimately causing its demise due to the lack of timely antibiotic treatment. Defendants disputed this theory and advanced the position that the adverse outcome was unpredictable and unpreventable because prenatal culture had limited effectiveness in identifying GBS, there was no way to determine whether plaintiff would have tested positive if cultured during the prenatal course and earlier administration of antibiotics would not have saved the baby.

Defendants presented testimony from Dr. Schulman that there would be no way at all to know or anticipate this virulent strain of GBS and the kind of outcome in this case. Dr. Wendel testified that the chance of culturing women is variable because some women shed the bacteria all of the time, and most women shed it intermittently. Dr. Wendel specifically testified that based on studies, data would support a determination that if plaintiff had been GBS-positive when she gave birth at 41 weeks, if she had been cultured at 35 weeks, 6 weeks before, and if she were a typical patient, she would have cultured negative. Dr. Marks testified that the baby died because of overwhelming GBS infection, which is an infection that is so large that the baby is unable to fight it despite antibiotics and has a high likelihood of death. Dr. Marks concluded that the baby's death was not preventable. Dr. Kelsey testified that because plaintiff had such a virulent strain of GBS, the prophylactic administration of antibiotics would not have prevented the baby's death. Dr. Kelsey also disputed that 90 % of mothers who delivered a baby infected with GBS tested positive for the organism when a prenatal culture was obtained. Dr. Kelsey

testified that "there is plenty of literature showing limitations of culture" and "there [are] a number of problems with the culture approach in particular." When defendants presented this testimony challenging plaintiff's theory of causation, it was essential to allow cross-examination to attempt to impeach defendant Dr. Kelsey and defendants' expert witnesses with contrary literature relating to the diagnostic capabilities and probabilities of detecting GBS with the use of prenatal cultures, as well as the efficacy of earlier antibiotic treatment. See Granberry, 285 Ill. App. 3d at 66.

Further, the record shows that each expert witness agreed that the standard of care in 1999 permitted physicians to choose one of two different options for managing possible GBS infections. The jury was never advised that the postevent literature discussed the standard of care and there is no dispute that the jury was ever advised that the standard of care changed. The jury also received separate written instructions that advised it of the distinction between standard of care and causation, and the jury was instructed that the only standard of care issue related to detection of GBS was whether defendant "[f]ailed to inform the plaintiff of the two acceptable approaches for the possible [detection] of [GBS] and allow her to choose the screening approach to be used." Thus, defendants' suggestion that "causation was inextricable from the standard of care" is unconvincing and defendants have failed to show that they suffered any prejudice attributable to the limited use of postevent literature. Nelson, 361 Ill. App. 3d at 422. Accordingly, we find no abuse of discretion in permitting plaintiff to elicit evidence related to postevent medical literature.

Defendants also contend that the circuit court erred by ruling that the introduction of

evidence that the risk-factor approach was equal to or more effective than the culture approach would open the door to the use of postevent literature.

Defendants' first motion *in limine* sought to exclude discussion of the standard of care after 1999 and references to the culture approach as the standard of care in 2002. In ruling on that motion, the circuit court held:

"Defendants' motion *in limine* number one is granted with the limitations I expressed. No defense witness will be offering testimony that one method yielded better results than another. If they do the door is opened. If they claim they are equal in terms of identifying an organism, that constitutes opening the door such that it would be relevant. If those things don't occur, the testimony is prohibited."

The record shows that Dr. Kelsey's testimony disputed that 90 % of mothers who delivered a baby infected with GBS tested positive for the organism when a prenatal culture was obtained. His testimony also included statements that "I think they are equal approaches. Both seem to be equally effective at reducing the risk of early onset GBS." Dr. Kelsey also stated "there is no scientific data to support one strategy over the other." Defendants' expert Dr. Wendel repeatedly denied the effectiveness of the culture approach and testified that there was no data suggesting the culture approach was more effective than the risk-factor approach, "because no one has ever done a comparative trial of the two of them." Based on this testimony with present tense language, the jury could have had the mistaken notion that no data existed to support one strategy over the other. The circuit court provided an adequate remedy by permitting limited questions

about the literature during cross-examination. When defendant and Dr. Wendel made these statements, it was essential to allow the cross-examination to rebut this testimony since the 2002 ACOG opinion unequivocally stated that the scientific data did find the culture approach more effective than the risk-factor approach. We therefore find no error where the medical literature was used for the limited purpose to impeach defendants' position on causation. Granberry, 285 Ill. App. 3d at 66.

### c. Foundation for 2002 Postevent Literature

Defendants next contend that the 2002 ACOG opinion should have been disallowed because no expert deemed it authoritative. It is the function of the trial court, in its discretion, to determine whether the foundational requirements have been met. See City of Chicago v. Anthony, 136 Ill. 2d 169, 186 (1990). Here, Dr. Fields offered testimony that the ACOG "is an educational forum that produces educational material that translate in their definition as guidelines. Many of these guidelines translate to the standard of care." Defendant Dr. Kelsey described ACOG as "the main organization" for obstetricians and gynecologists and testified that he relied on ACOG opinions. Dr. Kelsey testified that ACOG opinions are "educational materials" provided to physicians "so we can keep current. They summarize the current understanding, the current literature." We find no abuse of discretion where the circuit court determined that there was a proper foundation for the use of the 2002 ACOG opinion.

### d. Evidence of Hospital and Physician Personal Practices

Defendants next contend that they should have been allowed to introduce evidence

regarding the practice for GBS detection at Northwestern Memorial Hospital in Chicago,

Parkland Memorial Hospital in Dallas, Texas, and the defendant Ollendorf and Kelsey, Ltd.

Defendants' argument is based on the fact that the circuit court allowed defendants to impeach

plaintiff's expert Dr. Fields with written guidelines from Detroit hospitals and to elicit testimony

about these guidelines from their own expert, Dr. Schwartz, in order to perfect impeachment of

Dr. Fields.  Defendants maintain that they should have been allowed to use evidence of personal

practice in order to establish the standard of care because similar evidence was permitted for

impeachment purposes.

Our supreme court has determined that the personal practices used by a testifying expert

are not relevant and are insufficient to establish the applicable medical standard of care.  Schmitz

v. Binette, 368 Ill. App. 3d 447, 455-56 (2006), citing Walski v. Tiesenga, 72 Ill. 2d 249 (1978).

However, a medical expert's personal practices may well be relevant to that expert's credibility,

particularly when those practices do not entirely conform to the expert's opinion as to the

standard of care.  Schmitz, 368 Ill. App. 3d at 461.

In this case, during the course of defendants' cross-examination of Dr. Fields, defendants

successfully advocated that Dr. Fields opened the door to impeachment with the guidelines for

GBS detection from certain Detroit hospitals because he testified that his opinions about the

standard of care relating to informing the patient about the two approaches to GBS were based, in

part, on the practices of those hospitals.  Since the guidelines seemed to refute Dr. Fields'

testimony about the standard of care, we find that defendants were properly allowed to impeach

him with the guidelines since it impacted his credibility and affected the persuasive value of his

1-06-1296

opinions.  See <u>Gallina v. Watson</u>, 354 Ill. App. 3d 515, 521-22 (2004), *appeal denied*, 215 Ill. 2d 596 (2005).

However, this does not mean that defendants should have been allowed to introduce other evidence of physician personal practice for the substantive purpose of establishing the standard of care or defendants' compliance with it.  Defendants cite no legal authority in support of their argument that because evidence was properly submitted for impeachment purposes, similar evidence should also be admitted for the substantive purpose of establishing the standard of care. We therefore find no error in excluding evidence as to the personal practices used by physicians at certain hospitals.

### e.  Evidence of Plaintiff's Subsequent Pregnancies

Defendants lastly contend that the circuit court erred in barring defendants from introducing evidence about plaintiff's two subsequent pregnancies.  Following the death of her baby from GBS, plaintiff became pregnant on two other occasions and received prenatal care for at least one of those pregnancies from a different physician at Northwestern Memorial Hospital. In plaintiff's motion *in limine* number four, plaintiff sought to bar reference to her subsequent pregnancies, arguing it was irrelevant to the issue of damages.  In response, defendants denied that they intended to use the information in connection with plaintiff's claim of damages, but asserted that the information would be used to show plaintiff's "state of mind."  When asked to identify the issue for which state of mind might be relevant, defense counsel argued:

"[Plaintiff] went to Northwestern Memorial Hospital to another doctor who

followed the risk-factor approach, and I think the discussions that she had with

that doctor and the doctor's practices are relevant especially if plaintiff is claiming

she would have opted for the culture. I think it is very critical and relevant to her

decision-making processes. ***. I think her conduct and subsequent pregnancies

and her relationship with that doctor bears on her veracity and her credibility and

it is probative and relevant."

The circuit court granted plaintiff's motion *in limine* over defense counsel's objection.

"Whether granted or denied, a motion *in limine* itself does not preserve the issue for appellate review." Sullivan-Coughlin v. Palos Country Club, Inc., 349 Ill. App. 3d 553, 561 (2004). "Rather, to preserve an error in the exclusion of evidence, the proponent of the evidence must make an adequate offer of proof in the [circuit] court." Sullivan-Coughlin, 349 Ill. App. 3d at 561. "Failure to make such offer of proof results in waiver of the issue on appeal." Sullivan-Coughlin, 349 Ill. App. 3d at 561. Here, defendants failed to make a specific offer of proof regarding the testimony at issue and the issue is therefore waived.

Waiver aside, we find no abuse of discretion by the circuit court in barring testimony about plaintiff's two subsequent pregnancies where the court found the evidence was not relevant to any issue in this case. "The relevance and admissibility of evidence are committed to the sound discretion of the circuit court and its decisions will not be reversed absent a clear abuse of discretion." Clayton, 346 Ill. App. 3d at 384. "Evidence is considered to be relevant when it has ' "any tendency to make the existence of any fact that is of consequence to the determination of

the action more or less probable than it would be without the evidence." ' " Clayton, 346 Ill. App. 3d at 384, quoting Smith v. Silver Cross Hospital, 339 Ill. App. 3d 67, 73-74 (2003), quoting Wojcik v. City of Chicago, 299 Ill. App. 3d 964, 971 (1998).

Defendants sought to introduce evidence of plaintiff's relationship and discussions with a nonparty physician, as well as evidence of that physician's practices. As previously discussed, the personal practices of a nonparty physician were not relevant in this case. Schmitz, 368 Ill. App. 3d at 455-56. In addition, plaintiff's conversations which occurred during subsequent pregnancies were not relevant to the issue in this case of whether defendants should have advised plaintiff of the two different approaches to GBS detection in 1999. The information provided to plaintiff by her subsequent treating physician during later pregnancies would not have made any issue of consequence more or less probable. Finally, plaintiff did not follow the risk-factor approach in those subsequent pregnancies as she underwent cesarean section deliveries. Thus, we find no error in excluding this evidence.

## III. CONCLUSION

For the above reasons, we affirm the judgment of the circuit court

Affirmed.

CAMPBELL and MURPHY, JJ., concur.